1999 PA Super 25

COMMONWEALTH of Pennsylvania,
Appellant,

v.

Winifred MANNION, Appellee.

Superior Court of Pennsylvania.

Argued Sept. 28, 1998.

Filed Feb. 5, 1999.

Stuart B. Suss, Asst. Dist. Atty., West Chester, for Com., appellant.

Francis M. Walsh, Pottstown, for appellee.

Before McEWEN, President Judge, CAVANAUGH, DEL SOLE, KELLY, EAKIN, JOYCE, STEVENS, SCHILLER and LALLY–GREEN, JJ.

LALLY–GREEN, J.:

¶ 1 The Commonwealth appeals from the suppression court's order entered October 6, 1997,[1] granting Winifred Mann-

---

1. We note that the suppression court's order is dated October 3, 1997, but was entered on the docket on October 6, 1997. For purposes of clarity, we refer to this order as the "order entered October 6, 1997."

ion's motion to suppress oral and written statements made by her to Pennsylvania State Troopers. We reverse and remand for a trial.[2]

¶ 2 When reviewing an appeal from a suppression court's decision, we must first determine whether the record supports the court's factual findings. *Commonwealth v. Williams*, 539 Pa. 61, 71, 650 A.2d 420, 425 (1994). When the Commonwealth appeals from a suppression court's decision, we consider only the evidence of the defendant's witnesses and so much of the prosecution's evidence that remains uncontradicted when fairly read in the context of the record as a whole. *Commonwealth v. Prosek*, 700 A.2d 1305, 1307 (Pa.Super.1997). We are bound by the suppression court's factual findings when the evidence supports those findings; however, we may reverse the suppression court when it draws erroneous legal conclusions from those factual findings. *Williams*, 539 Pa. at 71–72, 650 A.2d at 426.

¶ 3 The record reflects the following facts. On June 24, 1996, Pennsylvania State Trooper John David Milligan traveled to the French Creek Sheep and Wool Company ("French Creek") to investigate an alleged theft of approximately $200,000 taken from French Creek. Eric and Jean Flaxenburg, the owners of French Creek, alleged that Mannion, French Creek's former bookkeeper, perpetrated the theft. During this investigation, Trooper Milligan obtained from the Flaxenburgs tally sheets prepared by French Creek's current bookkeeper. These tally sheets purported to demonstrate a theft.

¶ 4 On June 26, 1996, Trooper Milligan and Pennsylvania State Trooper John V. Sauers, both dressed in street clothes, traveled to Mannion's Chester County residence. Trooper Milligan had a weapon concealed under his suit coat. The troopers knocked on Mannion's door, identified themselves as state police troopers, and stated that they were investigating an alleged theft of approximately $200,000 taken from French Creek. Mannion expressed her familiarity with the

allegations, and stated that she had received a notice of intent to sue civilly filed against her by the Flaxenburgs. She also stated that because she viewed the troopers as neutral, she believed they could help her explain the situation to the Flaxenburgs. Mannion expressed her willingness to discuss the matter with the troopers, and invited them into her home. At that time, Trooper Sauers told Mannion that she: was not under arrest; was not required to speak with the troopers; could ask the troopers to leave at anytime; and could have an attorney present.

¶ 5 The troopers interviewed Mannion in her living room for approximately 1½ hours. During this time, Trooper Milligan reviewed the tally sheets with Mannion. Mannion denied any involvement in the theft. She stated that any error resulted from sloppy bookkeeping and the use of cash versus checks to pay certain suppliers that refused to take French Creek's checks. During and after this interview, neither trooper was convinced that a theft, as opposed to an accounting error, had occurred; or, if one had occurred, that Mannion was the perpetrator.

¶ 6 At the conclusion of the interview, Troopers Milligan and Sauers informed Mannion of their intention to return to French Creek to obtain further explanation and documentation from the Flaxenburgs. The troopers stated that they would telephone Mannion after they spoke with the Flaxenburgs to arrange for another meeting. The troopers informed Mannion that if she agreed to another meeting, it could take place at her home, her attorney's office, or the police barracks. Mannion expressed her agreement with this arrangement.

¶ 7 On June 27, 1996, Trooper Sauers obtained additional documentation from the Flaxenburgs, which he gave Trooper Milligan. Trooper Milligan then telephoned Mannion and arranged a second meeting at her home on June 28, 1996 at 10:00 a.m.

¶ 8 Troopers Milligan and Sauers, both dressed in street clothes, arrived at Mann-

---

**2.** The Commonwealth has certified in good faith that the suppression order substantially handicaps or effectively terminates its prosecution of this case. This permits appellate review of the suppression order. *Commonwealth v. Dugger*, 506 Pa. 537, 546–47, 486 A.2d 382, 386 (1985); Pa.R.App.P. 311(d).

ion's home at approximately 10:30 a.m. on June 28, 1996. Trooper Milligan had a weapon concealed under his suit jacket. When the troopers arrived, neither was convinced that a theft had occurred; or, if one had taken place, that Mannion was the perpetrator. The troopers knocked on Mannion's door, and she invited them in. Trooper Sauers then told Mannion that she: was not required to speak with them; was free to stop speaking with them at any time; and could ask them to leave at any time.

¶ 9 The troopers and Mannion commenced their conversation in the living room, but later moved to Mannion's dining room table to better examine the additional documentation furnished by the Flaxenburgs. During this meeting, Mannion offered the troopers tea or coffee and moved about freely as she smoked cigarettes. When her telephone rang, she asked permission to answer. In response, Trooper Sauers told Mannion that she was free to do as she wished. Mannion then answered the telephone and engaged in a conversation for roughly five minutes.

¶ 10 Approximately two hours into the interview, Mannion stated that she paid French Creek's electric and postage bills in cash. This statement caused both troopers to doubt Mannion's credibility. Trooper Sauers told Mannion that he did not believe a company the size of French Creek would pay utility and postage bills in cash because receipts were necessary for tax purposes. Trooper Sauers stated that he believed Mannion was lying, that things were not looking good for her, and that she was going to be arrested at some point in time. Trooper Sauers then stood up and walked beside Mannion. As Trooper Sauers stood alongside Mannion, he said in a low voice that he did not believe French Creek would pay its electric bills in cash. He also said that he

believed Mannion was lying and thought that she took the money to help her children.

¶ 11 At this point, Mannion began to cry and stated that: the Flaxenburg children had so much and were spoiled brats; she took the money to help her children because they deserved a better life; and Trooper Sauers was right. When Mannion stopped crying, she agreed to give a written statement, which she wrote on blank pages taken from Trooper Milligan's notebook. Mannion then asked whether the troopers were going to "drag her out of the house in cuffs." Trooper Sauers responded that Mannion would not be arrested that day. He explained that a complaint would be filed with the district justice's office and that Mannion would be notified and given an opportunity to turn herself in. Trooper Sauers further explained that Mannion would only be physically removed from her home if she failed to respond to the criminal complaint. Approximately one month later, on July 22, 1996, Mannion was formally charged with theft by unlawful taking or disposition and receiving stolen property.

¶ 12 Prior to trial, Mannion moved to suppress her statements to the troopers, alleging that she was not given *Miranda*[3] warnings and the statements were the product of a custodial interrogation. After a hearing, the suppression court granted Mannion's motion.

¶ 13 The Commonwealth filed a motion to reconsider. In response, the suppression court vacated its original order, accepted written submissions from counsel, heard reargument, and issued a second order that essentially reinstated its original order.[4] The Commonwealth appealed, and a panel of this Court affirmed the suppression court's order. We thereafter granted the Common-

---

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (a defendant that is subject to custodial interrogation must be advised of his or her constitutional right to remain silent and his or her right to a lawyer in clear and unequivocal language); *Commonwealth v. Johnson*, 373 Pa.Super. 312, 541 A.2d 332, 336 (1988) (citations omitted) (a person must be informed of her *Miranda* warnings prior to custodial interrogation by police).

4. In its order entered October 6, 1997, the suppression court reinstated its August 19, 1997 order and memorandum opinion, and corrected one word in its August 19, 1997 opinion. The order entered October 6, 1997 also contains a footnote that addresses certain minor arguments raised by the Commonwealth on reargument. The order did not change the reasoning or legal analysis of the suppression court's original August order.

wealth's petition for reargument *en banc* and withdrew our previous decision. This appeal followed.

¶ 14 The Commonwealth frames its issue on appeal as follows:

Did the lower court commit an error of law by suppressing defendant's statements while utilizing a legally incorrect definition of custody, and erroneously concluding that a reasonable person, under the circumstances confronting this defendant, could have perceived herself to be in custody?

Appellant's Brief at 4.

¶ 15 We first address the Commonwealth's claim that the suppression court used a legally incorrect definition of "custody" when determining whether Mannion's statements were the product of custodial interrogation so as to require *Miranda* warnings. A law enforcement officer must administer *Miranda* warnings prior to custodial interrogation. *Commonwealth v. Johnson*, 373 Pa.Super. 312, 541 A.2d 332, 336 (1988). The standard for determining whether an encounter with the police is deemed "custodial" or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated. *Commonwealth v. Gwynn*, ── Pa. ──, ──, 723 A.2d 143, 148 (1998). Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Johnson*, 541 A.2d at 336 *quoting Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). "Interrogation" is police conduct "calculated to, expected to, or likely to evoke admission." *Id. quoting Commonwealth v. Simala*, 434 Pa. 219, 226, 252 A.2d 575, 578 (1969). When a person's inculpatory statement is not made in response to custodial interrogation, the statement is classified as *gratuitous*, and is not subject to suppression for lack of warnings. *Id.*

¶ 16 The appropriate test for determining whether a situation involves custodial interrogation is as follows:

The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.

*Commonwealth v. Busch*, 713 A.2d 97, 100 (Pa.Super.1998) *quoting Commonwealth v. Rosario*, 438 Pa.Super. 241, 652 A.2d 354, 365–66 (1994) (*en banc*), *appeal denied*, 546 Pa. 668, 685 A.2d 547 (1996) (other citations omitted). Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest. *Commonwealth v. Ellis*, 379 Pa.Super. 337, 549 A.2d 1323, 1332 (1988), *appeal denied*, 522 Pa. 601, 562 A.2d 824 (1989), citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

¶ 17 The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. *Busch*, 713 A.2d at 101. The fact that a police investigation has focused on a particular individual does **not** automatically trigger "custody," thus requiring *Miranda* warnings. *Commonwealth v. Fento*, 363 Pa.Super. 488, 526 A.2d 784, 787 (1987).

¶ 18 The record reflects that the suppression court utilized the following definition of "custody" for *Miranda* purposes:

In order to be "in custody[,]" a person must believe that he is not free to leave, and in order to be considered "interroga-

tion[,]" the questioning by the police must be "expected to, calculated to, or likely to evoke admission." *Commonwealth v. Brantner*, 486 Pa. 518, 527, 406 A.2d 1011, 1016 (1979). In order to answer the Constitutional questions that are raised in this motion, therefore, it is first necessary to determine whether a reasonable person in Mrs. Mannion's situation would have felt free to leave and whether the questioning of the police amounted to interrogation. A person is deemed in custodial interrogation if he is placed in a situation in which he reasonabl[y] believes that his freedom of action is restricted by the interrogation. *Commonwealth v. Zogby*, 455 Pa.Super. 621, 623, 689 A.2d 280, 282 (1997) ( [a]cknowledging that Pennsylvania's standard for police conduct is more restrictive than that of the Federal Constitution.)

Trial Court Opinion, 8/19/97, reinstated and corrected 10/3/97, at 6. Since the suppression court's standard is consistent with the law set out above, the suppression court did not err when it defined custody as it did for

purposes of determining whether Mannion's inculpatory statements were the product of custodial interrogation so as to require *Miranda* warnings.

¶ 19 The Commonwealth argues that custody is triggered only when the suspect is subject to "restraints comparable to those associated with an arrest," Appellant's Brief at 10, 15, and supports its argument by reference to cases involving traffic stops.[5] As the above discussion reflects, police detentions in Pennsylvania become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest. *See Busch*, 713 A.2d at 100 and *Ellis*, 549 A.2d at 1332. Thus, a reviewing court is to consider the particular facts of each case in order to determine whether a detention is custodial. While we agree that the Commonwealth's articulation of the law is accurate, we do not, however, conclude that what factually is deemed a "restraint comparable to those associated

---

5. The Commonwealth relies on the following cases, all of which are traffic-stop cases: *Commonwealth v. Gonzalez*, 519 Pa. 116, 546 A.2d 26 (1988) (defendant-motorist's statement made in response to police questioning at accident scene without *Miranda* warnings held admissible in prosecution for driving under the influence, two counts of involuntary manslaughter, and two counts of homicide by vehicle while driving under the influence because: defendant was not under arrest, defendant's freedom was restricted only to extent of statutory obligation to stay at scene and provide required information and defendant failed to demonstrate that he was subjected to restraints comparable to those associated with arrest); *Commonwealth v. Proctor*, 441 Pa.Super. 176, 657 A.2d 8 (1995) (defendant-motorist detained at accident scene for questioning was not in custody for *Miranda* purposes where: motorist remained at scene for only short time period to allow police officer to complete investigation; motorist was not informed that detention would not be temporary; single trooper questioned defendant; field sobriety test conducted in plain view of passing motorists failed to constitute coercive activity equivalent to station house interrogation; motorist had duty under state law to remain at accident scene and cooperate with police because his freedom of movement was not inhibited in any significant way); *Commonwealth v. Leib*, 403 Pa.Super. 223, 588 A.2d 922 (1991) (defendant-motorist's statements not suppressed because noncoercive, temporary detention aspects of ordinary traffic stops are not custody for *Miranda* purposes even though such stops are seizures within meaning of

Fourth Amendment, because they are typically brief, as opposed to prolonged station house interrogation; they commonly occur in public view, an atmosphere far less police dominated than that surrounding the kinds of interrogation at issue in *Miranda* itself; and therefore, detained motorist's freedom of action not curtailed to a degree associated with formal arrest) (citing and relying on*Pennsylvania v. Bruder*, 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988)); *Commonwealth v. Sullivan*, 399 Pa.Super. 124, 581 A.2d 956 (1990) (defendant-motorist not in custody for *Miranda* purposes when subject to an ordinary traffic stop and not placed under arrest, forced to enter a police patrol car, subjected to coercion, or subject to prolonged questioning); *Commonwealth v. Haupt*, 389 Pa.Super. 614, 567 A.2d 1074 (1989) (traffic stop constituted investigative detention, as opposed to custodial detention; and, therefore, *Miranda* warnings not required because basis for detention was traffic violation; stop endured approximately 15 to 20 minutes; location was public street; defendant-motorist not transported; no restraints used; and police officer made no show, threat, or use of force); *Commonwealth v. Toanone*, 381 Pa.Super. 336, 553 A.2d 998 (1989) (defendant-motorist not entitled to *Miranda* warnings prior to questioning regarding educational background and request to recite alphabet because motorist not interrogated for unreasonably long period, forced to enter patrol car, or subjected to any form of undue coercion).

with an arrest" in traffic stop cases is automatically applicable in other factual settings.

¶ 20 The usual traffic stop constitutes an investigative rather than a custodial detention, unless, under the totality of the circumstances, the conditions and duration of the detention become the functional equivalent of arrest. *Commonwealth v. Haupt*, 389 Pa.Super. 614, 567 A.2d 1074, 1078 (1989). Since an ordinary traffic stop is typically brief in duration and occurs in public view, such a stop is not custodial for *Miranda* purposes. *Commonwealth v. Leib*, 403 Pa.Super. 223, 588 A.2d 922 (1991).

¶ 21 Also, a motorist has certain statutory obligations to stop, to remain at the scene of an accident, and to provide information. A motorist has a statutory duty to bring his vehicle to a stop when a police officer so directs. 75 Pa.C.S.A. § 3733(a). When a motorist is involved in an accident, he has a statutory duty to immediately stop, remain at the scene, and provide certain information. 75 Pa.C.S.A. §§ 3742–44. Thus, a motorist is not in custody for *Miranda* purposes when his freedom is restricted to the extent of his statutory obligation to remain at the scene and provide required information. *See Commonwealth v. Gonzalez*, 519 Pa. 116, 124, 546 A.2d 26, 29 (1988).

¶ 22 An ordinary traffic stop becomes "custodial" when the stop involves coercive conditions, including, but not limited to, the suspect being forced into a patrol car and transported from the scene or being physically restrained. *See infra*, n. 5. Such coercive conditions constitute "restraints comparable to arrest" so as to transform the investigative nature of an ordinary traffic stop into custodial interrogation. Thus, where a motorist has statutory obligations that necessarily restrict his freedom of action or movement, reliance on traffic stop cases is appropriate to determine what coercive conditions are necessary to transform this type of investigative detention into custodial interrogation. However, where no such statutory obligations exist, reliance on cases involving brief and public stops and statutory obligations is not helpful. In conclusion, whether a person is in custody for *Miranda* purposes must be evaluated on a case-by-case basis with due regard to the particular facts involved.

¶ 23 The Commonwealth next argues that even if the suppression court correctly articulated the definition of custody, the legal conclusions drawn from the facts were incorrect because Mannion's statements were not the product of custodial interrogation. Following a review of the record, we find merit to the Commonwealth's arguments.

¶ 24 As noted above, while we are bound by the suppression court's factual findings which are supported by the evidence, we may reverse the suppression court when it draws erroneous legal conclusions from those factual findings. *Williams*, 539 Pa. at 71–2, 650 A.2d at 426. Here, the suppression record clearly reflects that custodial interrogation had not occurred when Mannion made her statements. The record reveals that prior to the June 28, 1996 meeting, Trooper Milligan obtained Mannion's permission before speaking with her. At this time, Mannion not only agreed to meet with the troopers in her home, but she also chose that location. Once the troopers arrived, they informed Mannion that she was not required to speak with them, could refuse to speak at anytime, and could ask them to leave at any time. Mannion nevertheless invited the troopers into her home and voluntarily submitted herself to questioning.

¶ 25 During the meeting, Mannion offered the troopers tea or coffee and moved about freely as she smoked cigarettes. When the telephone rang and interrupted the meeting, Mannion asked permission to answer. At this time, Trooper Sauers informed Mannion that she was free to do as she pleased. Mannion then engaged in a telephone conversation for approximately five minutes. At all times, Mannion was free to move about her home, free to do what she wanted, including taking a telephone call, free of any type of police restraint and free of the fear of imminent arrest. At no time did the troopers search Mannion, remove her from her home, or use any type of restraints. Additionally, the troopers made no show, threat, or use of force. Moreover, Mannion

herself had stated that she viewed Troopers Milligan and Sauers as neutral and she believed they could help her explain the situation to the Flaxenburgs.

¶ 26 It was not until Mannion stated that she paid French Creek's electric and postage bills in cash that both troopers doubted her credibility. At this point, Trooper Sauers told Mannion that: he believed she was lying; things were not looking good for her; and she was going to be arrested at some point in time. He then stood up and walked beside Mannion. While standing alongside Mannion, and immediately prior to her confession, Trooper Sauers said in a low voice that he did not believe French Creek would pay its electric bills in cash, that he believed Mannion was lying, and that he thought she took the money to help her children. Even if the police investigation did at that point focus on Mannion, custodial interrogation was not automatically triggered. *Ellis*, 549 A.2d at 1332. Moreover, the fact that Trooper Sauers spoke in a low voice, in and of itself, fails to evidence any threat of force or coercion. Rather, the uncontradicted testimony of the troopers establishes that Mannion's statements were gratuitous. In addition, the record reflects no testimony that Mannion indicated she felt intimidated by the troopers or that her freedom was restricted.

¶ 27 Under the totality of these circumstances, Mannion's conduct was consistent with a willing and cooperative witness. The record does not support the suppression court's conclusions that Mannion was under arrest or subject to coercion from which she could reasonably believe she was in custody.[6] Therefore, we hold that Mannion's statements were not the product of custodial interrogation, *Miranda* rights did not attach, and her statements should not have been suppressed.

¶ 28 The dissent asserts that we failed to evaluate important factors relied on by the suppression court. To the contrary, we were quite careful to evaluate whether the court's findings were supported by the *record*. Also, the dissent observes that the trial court had the benefit of hearing the testimony of the suppression witnesses firsthand and of observing their demeanor. Yet, we point out that the only suppression witnesses were the two police officers, neither of whom testified that their voices were menacing, or that Mannion did not feel comfortable enough to answer her phone or to ask them to leave. Our record review revealed that the learned court's conclusions were not supported by the record, despite the opportunity to observe the demeanor of the police officer witnesses. We understand that Mannion was in her sixties and the events took place in her home and we also are sensitive to the way we might feel should these events occur to us in our own homes. Nevertheless, since our review of the record indicates that some of the suppression court's findings lacked record support, we are not able to reach the dissent's *"inexorable conclusion* that Mannion did not feel free to ask the officers to leave."

¶ 29 Order reversed and case remanded for a trial. Jurisdiction relinquished.

¶ 30 Judge SCHILLER files a dissenting opinion in which President Judge McEWEN, Judges CAVANAUGH and DEL SOLE join.

SCHILLER, J., dissenting:

¶ 1 I agree with the majority's analysis of the legal standard to be applied in custodial interrogations; however, I must respectfully dissent from the majority's application of that standard in the instant case.

¶ 2 The issue here is not the legitimacy of the troopers' suspicions at the time the questioning was conducted, but rather whether

---

**6.** We contrast the instant facts from those in *Commonwealth v. Zogby*, 455 Pa.Super. 621, 689 A.2d 280 (1997) wherein we affirmed the suppression court's order granting defendant-appellee's motion to suppress oral statements and physical evidence. Unlike the instant case, in *Zogby*, we held that defendant-appellee was in custodial detention when a law enforcement officer entered his bedroom, aroused him from a sound sleep, and "advised" or requested him to come downstairs to answer some questions without informing him that he could decline the request. Under the totality of these circumstances, we held that it was highly unlikely that defendant-appellee believed, or that anyone similarly situated would believe, that he could simply turn over and go back to sleep. Therefore, we held that the incriminating statements he thereafter made to the officer without the benefit of *Miranda* warnings were properly suppressed.

the troopers used coercive tactics to obtain Appellee's self-incriminating statements. Based on the facts of this case, I conclude that an individual in Mannion's situation would have felt that her freedom was significantly curtailed, and that the conditions of the interrogation sustained for more than two hours made her a virtual prisoner in her own home. Because I believe that the troopers' tactics did not comport with *Miranda* requirements, and that the suppression court's findings of fact and inferences drawn therefrom are reasonable based on the record, I must respectfully dissent.

¶ 3 The procedural safeguards of the Fifth Amendment and one's privilege against self-incrimination have long been recognized in our federal and state courts as the "hallmark of our democracy" and the "essential mainstay of our adversary system". *Miranda v. Arizona*, 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966) (citations omitted). Despite the apparently harsh remedy of excluding evidence, the courts have consistently recognized that "an accused must not be *compelled* to incriminate himself." *Commonwealth v. Ziegler*, 503 Pa. 555, 562, 470 A.2d 56, 59 (1983). Indeed, "the [*Miranda*] warnings were instituted to protect an accused from giving statements as a result of having his will overborne by coercive police tactics." *Id.*[7]

¶ 4 To that extent, the prosecution is prohibited from using inculpatory statements that are derived from a "custodial interrogation" unless *Miranda* warnings are administered. Moreover, our courts have consistently applied an objective test in which the court must consider the nature of the encounter and the totality of the circumstances to determine whether an individual would reasonably believe that her freedom of action was restricted by the interrogation, thus triggering *Miranda* warnings. *Commonwealth v. Gwynn*, —— Pa. ——, ——, 723 A.2d 143, 148 (1998) (emphasis added).

¶ 5 As the facts of this case are not in dispute, our sole inquiry is to determine whether the legal inferences drawn by the suppression court are reasonable. *Commonwealth v. Gommer*, 445 Pa.Super. 571, 665 A.2d 1269, 1270 (1995), *appeal denied*, 546 Pa. 676, 686 A.2d 1308 (1996) (citation omitted). The suppression court drew the following legal inferences from the evidence presented at the suppression hearing:

> In the case *sub judice*, although Mrs. Mannion was in her own home and the detectives had told her some two hours prior that she was free to not answer their questions, the totality of the circumstances of having two police officers in her home questioning her for the second time for over two hours and changing their tone with her from conversational to accusatorial while standing menacingly close to her, would have led a reasonable person, especially a woman 63 years of age, to believe that she was in custody. The fact that she felt that she had to ask permission to answer her phone shows that even before the police became accusatorial she did not feel free. In addition, before confessing to her crime, she was crying, and after confessing she asked if she would be "dragged out" that day.
>
> ... we believe that Tpr. Sauers' accusation that Mrs. Mannion was lying and would be arrested, followed by his immediately rising from his chair to stand close beside her and repeat in a low voice that he believed she did it, adding that she probably did it for her children, amounted to the classic coercion and erosion of an independent will to not incriminate oneself upon which *Miranda* warnings were founded.

Trial Court Opinion, 8/19/97, reinstated and corrected 10/3/97, at 6–7. Based on a thorough and independent review of the record, I agree with the suppression court's conclusion that the police conduct was carefully calculated to elicit an admission and that a reasonable person in Mannion's situation would not have felt free to leave or to ask the troopers to leave. I would therefore find that the suppression court's inferences drawn from the evidence are legitimate and reasonable.

---

7. As Justice Oliver Wendell Holmes, Jr. opined in *Olmstead v. United States*, 277 U.S. 438, 470, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Dissent), " ... it is a less evil that some criminals should escape, than that the government should play an ignoble part."

¶ 6 The majority acknowledges that the suppression court used the correct test in determining whether Mannion's statements were the product of custodial interrogation so as to require *Miranda* warnings. *See Commonwealth v. Gwynn, supra.* However, the majority fails to apply the "totality of the circumstances" test to the facts of the case. Instead, the majority singles out certain of the suppression court's factual findings and discounts others.[8] Specifically, the majority states that, even assuming the police investigation did focus on Appellee, a "custodial interrogation was not *automatically* triggered." (emphasis added). The majority further maintains, "the fact that Trooper Sauers spoke in a low voice, *in and of itself*, fails to evidence any threat of force or coercion." (emphasis added).

¶ 7 While it is true that neither of these factors, viewed alone, triggers *Miranda* warnings *per se, Commonwealth v. Ellis*, 379 Pa.Super. 337, 549 A.2d 1323, 1332 (1988), *appeal denied*, 522 Pa. 601, 562 A.2d 824 (1989), such factors are extremely relevant in determining whether a custodial interrogation took place based on the totality of the circumstances. *See Commonwealth v. Busch*, 713 A.2d 97, 101 (Pa.Super.1998). Yet, the majority fails to evaluate these important factors *together* and *along with the many other factors* found and relied upon by the trial court, including Mannion's age, the accusatorial tone and menacing conduct of the troopers, the duration of the *second* interrogation, the trooper's statement that she was lying and that she would be arrested, and the fact that she did not feel comfortable

enough in her own home to answer the phone or to ask the troopers to leave. Had the majority assessed these factors along with the others *in their totality*, they would have come to the inexorable conclusion, as did the suppression court, that Mannion did not feel free to ask the officers to leave.[9] Thus, the majority's conclusion that Appellee was not in custody when she made inculpatory statements to police is erroneous and inconsistent with the "totality of the circumstances" test as enunciated in case law and borne out from the facts in the case *sub judice*.

¶ 8 Further, the learned and experienced suppression court had the benefit of hearing the testimony firsthand and observing the demeanor of the witnesses. Accordingly, the suppression court was in the best position to determine whether a reasonable person in Mannion's situation would have felt free to ask the officers to leave her residence. Moreover, the facts as adduced by the suppression court were supported by the record. It is not within the province of this Court, based on a cold record, to substitute our judgment for that of the suppression court absent an error of law. *Commonwealth v. Prosek*, 700 A.2d 1305, 1308 (Pa.Super.1997); *Commonwealth v. Rosario*, 438 Pa.Super. 241, 652 A.2d 354, 365 (1994), *appeal denied*, 546 Pa. 668, 685 A.2d 547 (1996). The majority fails to demonstrate such an error in this case.

¶ 9 Accordingly, I would affirm the order entered by the trial court granting Appellee's motion to suppress.[10]

---

8. In explaining the rationale behind *Miranda* requirements, Chief Justice Earl Warren stated, "it [is] necessary to insure that what was proclaimed in the Constitution ha[s] not become but a 'form of words' in the hands of government officials." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (citation omitted).

9. This conclusion is particularly justified in light of our recent decision in *Commonwealth v. Zogby*, 455 Pa.Super. 621, 689 A.2d 280 (1997). In *Zogby*, we stressed the inherently coercive nature of an encounter between a civilian and a police officer:
   ... it must be remembered that a police officer is an authoritative figure and that an officer's authority is commonly reinforced when encountering a "suspect".... "The police offi-

cer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him."
*Commonwealth v. Zogby, supra*, at 282 (citation omitted).

10. I note that my conclusion here does not conflict with our recent decision in *Commonwealth v. Busch*, 713 A.2d 97 (Pa.Super.1998). In *Busch*, the trial court found that the officers questioned the suspect during a second visit at his home for one-half hour or less, the suspect felt comfortable enough to ask the officers to leave his home, and the officers complied. Despite the fact that the suspect was told he was the focus of the investigation, this Court held that the

¶ 10 President Judge McEWEN, Judges CAVANAUGH and DEL SOLE join the Dissenting Opinion by Judge SCHILLER.

trial court erred in granting the motion to suppress absent additional evidence that a "deprivation of liberty" was present. *Busch, supra* (citing *Commonwealth v. McLaughlin,* 475 Pa. 97, 379 A.2d 1056 (1977)). In this case, the evidence at the suppression hearing established that the questioning on the second visit lasted approximately two hours, Appellee became the focus of the investigation, and she reasonably believed her freedom of movement was restricted. Thus, *Busch, supra,* is distinguishable from the case *sub judice.*