J-S19005-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| GABRIEL MARTINEZ-LOPEZ, | |
| Appellant | No. 2248 EDA 2014 |

Appeal from the Judgment of Sentence Entered March 27, 2014
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0003402-2010

BEFORE:  BENDER, P.J.E., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MAY 03, 2016**

Appellant, Gabriel Martinez-Lopez, appeals from the judgment of sentence of life imprisonment, without the possibility of parole, plus consecutive terms of incarceration of 20 to 40 years, and 11½ to 23 months, imposed after he was convicted of, *inter alia*, first-degree murder, kidnapping, robbery, and criminal conspiracy.  Appellant challenges the trial court's denial of his motion to suppress statements he made to police, and the discretionary aspects of his sentence.  After careful review, we affirm.

We summarize the facts and procedural history of Appellant's case as follows.  On April 9, 2010, Upper Merion Police, and members of the Montgomery County Detective Bureau, were dispatched to 148 Walker Lane in King of Prussia, Pennsylvania.  Upon their arrival, police discovered the beaten body of Jose Armando Cazares-Olarte (hereinafter "the victim").

After processing the crime scene, police surmised that the victim had been killed at a different location, and his body dumped on Walker Lane. An autopsy revealed that the victim died as a result of numerous blunt force injuries to his head, face, and torso, and the manner of death was ruled a homicide. The victim's phone records revealed that Appellant was the last person to call the victim on the day of the murder.

On April 27, 2010, police interviewed Appellant. While he initially denied any involvement in the murder, he eventually admitted that he and the victim's wife, Delia Hernandez-Cortes (hereinafter, "Delia"), were involved in an affair. Appellant further confessed that Delia told him that the victim was physically abusing her, and she asked Appellant to kill him. Appellant agreed, and enlisted his brother, Miguel Martinez (hereinafter, "Miguel"), to assist him. Appellant told police that on the night of the murder, he and Miguel kidnapped the victim at gunpoint, forced him into the bed of their truck, and drove him to their home at 349 Heritage Lane in King of Prussia. During this time, Delia was in frequent contact with Appellant, asking him about the events taking place.

Once Appellant and Miguel arrived at their home with the victim, they removed him from the truck and ordered him to the ground. Appellant then grabbed a large retaining wall block and struck the victim with it in the back of the head. He then put a plastic bag around the victim's neck, attempting to suffocate him. Once the victim died, they loaded his body back into the truck and dumped it at the location where it was later discovered by police.

The brothers then returned to their home to clean up. Appellant also told police that he hid the victim's keys, cell phone, and one of the victim's sneakers in his home. Police later discovered those items inside Appellant's residence. Appellant stated that at 6:40 a.m. on the morning after the murder, Delia called to ask him if the victim was dead, and Appellant informed her that he was.

Investigating detectives also interviewed Miguel, who essentially corroborated Appellant's version of the murder. Miguel added that Appellant had struck the victim three times in the head with the brick, and after the victim collapsed to the ground, Miguel took the rock and threw it at the victim's head.

After obtaining confessions from Appellant and Miguel, police interviewed Delia on April 30, 2010. Delia admitted that she and Appellant conspired to kill the victim because he had been physically and mentally abusive to Delia. Delia claimed that she confided in Appellant about the abuse, and Appellant suggested that he kill the victim for Delia. She agreed, and offered to pay Appellant by giving him the victim's truck after the murder.

Appellant, Miguel, and Delia were all charged as co-defendants. Before trial, however, Miguel and Delia entered guilty pleas to third-degree murder and related offenses in exchange for testifying against Appellant. Prior to Appellant's trial, he filed a motion to suppress the statements he provided to police on April 27, 2010. A suppression hearing was conducted

on August 13, 2013, after which the court denied Appellant's motion to suppress.

Appellant's case proceeded to a jury trial, at which Miguel and Delia, among others, testified for the Commonwealth. Appellant also took the stand in his own defense. At the conclusion of trial, the jury convicted Appellant of first-degree murder, kidnapping, robbery, criminal conspiracy, possession of a firearm by an illegal alien, and criminal solicitation. The trial court ordered a pre-sentence investigation report (PSI), and conducted a sentencing hearing on March 27, 2014. At the conclusion thereof, the court sentenced Appellant to a mandatory term of life imprisonment, without the possibility of parole, for his first-degree murder offense. The court also imposed a consecutive term of 20 to 40 years' incarceration for Appellant's conspiracy conviction, and a consecutive term of 11½ to 23 months' imprisonment for his firearm offense. Additionally, the court imposed two concurrent terms of twenty years' probation for the kidnapping and robbery convictions.

Appellant filed a timely, post-sentence motion to modify his sentence, which was ultimately denied by operation of law. Appellant filed a timely notice of appeal,[1] and also timely complied with the trial court's order to file

_____

[1] There were several, peculiar procedural issues that arose between Appellant's filing of his post-sentence motion and his notice of appeal that need not be discussed for purposes of our review. A detailed summary of

*(Footnote Continued Next Page)*

a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Herein, Appellant presents two issues for our review:

> [(1)] Did the [t]rial [c]ourt err in denying Appellant's [m]otion to [s]uppress the statement that [p]olice took from him on April 27, 2010; where the same was taken without a voluntary, knowing and intelligent waiver of Appellant's **Miranda**[2] rights?
>
> [(2)] Did the [t]rial [c]ourt abuse its discretion in sentencing Appellant to [l]ife in [p]rison, plus consecutive terms of twenty (20) to forty (40) years and eleven and one half (11½) to twenty three (23) months of incarceration on the charges of [f]irst[-d]egree [m]urder, [c]riminal [c]onspiracy to commit [f]irst[-d]egree [m]urder and [p]ersons [n]ot to [p]ossess [f]irearms, respectively; where the evidence introduced at trial showed [Appellant's] actions to be a single criminal episode and not separate and distinct incidents of criminality?

Appellant's Brief at 5.

In his first issue, Appellant challenges the trial court's denial of his pretrial motion to suppress inculpatory statements he gave to police on April 27, 2010. Our standard of review for denial of a suppression motion is as follows:

> In reviewing an order from a suppression court, we consider the Commonwealth's evidence, and only so much of the defendant's evidence as remains uncontradicted. We accept the suppression court's factual findings which are supported by the evidence and reverse only when the court draws erroneous conclusions from those facts.

*(Footnote Continued)* ——————————

those issues is set forth by the trial court in its Pa.R.A.P. 1925(a) opinion. **See** Trial Court Opinion (TCO), 3/13/15, at 5-7.

[2] **Miranda v. Arizona**, 384 U.S. 436 (1966).

*Commonwealth v. Hoopes*, 722 A.2d 172, 174-75 (Pa. Super. 1998).

Here, Appellant provided police with five written statements throughout the day on April 27, 2010. The first of those five written statements was given before Appellant received *Miranda* warnings. Additionally, just prior to receiving *Miranda* warnings, Appellant made an oral, inculpatory statement to police, which triggered their providing him with his *Miranda* rights and obtaining his written waiver thereof. Following his waiver of his rights, Appellant gave police four more written statements, which culminated in Appellant's confessing to the crime.

Appellant does not contest the validity of his waiver of his *Miranda* rights; rather, he contends that he was in custody when his first written statement was given and, because *Miranda* rights had not been provided to him at that point, his constitutional rights were violated, and all five of his statements should have been suppressed. We assess this argument with the following legal principles in mind:

> A law enforcement officer must administer *Miranda* warnings prior to custodial interrogation. The standard for determining whether an encounter with the police is deemed "custodial" or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated. Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." "Interrogation" is police conduct "calculated to, expected to, or likely to evoke admission." When a person's inculpatory statement is not made in response to custodial interrogation, the statement is classified

as gratuitous, and is not subject to suppression for lack of warnings.

The appropriate test for determining whether a situation involves custodial interrogation is as follows:

The test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.

Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.

The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring *Miranda* warnings.

*Commonwealth v. Mannion*, 725 A.2d 196, 200 (Pa. Super. 1999) (internal citations omitted).

At the suppression hearing in this case, the Commonwealth presented the testimony of Detective Richard Nilsen, who worked for the Montgomery County Detective Bureau at the time Appellant was interviewed on April 27, 2010. Detective Nilsen testified that on that day, he and another detective from the Upper Merion Township Police Department went to Appellant's residence at approximately 9:30 a.m. N.T. Suppression Hearing, 8/13/13,

at 9.  The detectives were dressed in plainclothes and were driving an unmarked, sport utility vehicle (SUV) that had no "radios or sirens or anything like that[.]" *Id.* at 10-11.  Detective Nilsen stated that they knocked on Appellant's door and told a woman who answered that they were there to speak to Appellant.  *Id.* at 10.  Detective Nilsen said Appellant "came out immediately[,]" the detectives explained who they were and "that [they] were … investigating a homicide[,] and asked if [Appellant] would be willing to come with [them] to … the police station to answer some questions."  *Id.*  Detective Nilsen testified that Appellant willingly "grabbed his coat" and got into the backseat of the SUV to travel to the police department.  *Id.* at 11, 47.  Detective Nilsen stated that at no point was Appellant placed in any sort of restraints.  *Id.* at 13.  The detective also testified that there was no "shield or separation divider between the front and the rear passenger compartment" of the SUV in which Appellant was transported.  *Id.* at 47.

During the trip to the police station, which lasted only a "few minutes," *id.*, Appellant was "completely cooperative" and "friendly" with the detectives, and engaged in "casual conversation related to his present employment …."  *Id.* at 12.  Once the three men arrived at the station, the detectives took Appellant to a "dual office" used by two detectives.  *Id.*  The office contained two desks and was approximately 12 feet by 10 feet in size.  *Id.* at 14.  The detectives "sat [Appellant] down in front of the desk[,]" with Detective Nilsen sitting behind the desk and the other detective sitting off to

Appellant's right. *Id.* at 14. The detectives "asked [Appellant] if he needed anything[,]" such as "food, drink[,] or whether he needed … to use the bathroom." *Id.* at 13. Appellant had a cup of coffee at that time. *Id.* at 14; *see also* "Investigation Interview Form" (Commonwealth's Exhibit C-1; (admitted at N.T., 8/13/13, at 107), 4/27/10, at 1 (Appellant's stating that he was offered something to eat and drink and he had coffee).

Detective Nilsen testified that he then "had a conversation" with Appellant that "started off with just more biographical information about him, where he worked, his family, things like that." *Id.* at 15. Detective Nilsen noted that during the conversation with Appellant, his tone was "[c]ordial," and he was "speaking to [Appellant] as [he] would to any other witness or person that [he] would talk to." *Id.* at 18. The detective "started to ask [Appellant] about … people involved in [the] investigation, whether he had known them and things like that." *Id.* at 15. Appellant essentially told the detectives that he knew the victim's wife, Delia, from work, but he claimed to not know the victim. *Id.* at 19. After talking with Appellant for approximately 40 minutes, Detective Nilsen asked Appellant if they could reduce their conversation to a written statement, and Appellant agreed. *See* "Investigation Interview Form" at 1. At the start of that written statement, Detective Nilsen asked Appellant, "did we tell you that you are not under arrest and [are] free to leave if you want?" *Id.* Appellant stated, "Yes." *Id.* Questions posed to him and his answers were then recorded and reviewed with Appellant and he signed the statement at the

end. N.T. at 21. The transcription of Appellant's first written statement concluded at 11:36 a.m. *See* "Investigation Interview Form" at 6.

At that point, the detectives told Appellant they would take "a little bit of a break." *Id.* at 21. They asked Appellant if he wished "to use the bathroom or … wanted anything." *Id.* The detectives then left to "find out … what was going on with the investigation." *Id.* at 22. Shortly thereafter, they returned to Appellant "and presented [him with] some information that … conflicted with what he had just told [them]." *Id.* at 22. Appellant then changed his original story, describing more about his relationship with Delia and admitting that he did know the victim. *Id.* During the course of this second statement, Appellant asked for an interpreter, saying "it would be easier to explain in Spanish[.]" *Id.* at 26. Detective Vincent Fuentes entered the office and began interpreting for Appellant. *Id.* at 27. At approximately 1:00 p.m., Appellant "said something about striking the victim with a rock." *Id.* at 27.

Detective Nilsen testified that "at that point, [he] just paused the statement, … and asked for Detective Fuentes to assist [him] with giving *Miranda* warnings in Spanish and English." *Id.* at 27. Detective Nilsen stated that they used "the standard bilingual form" to provide Appellant with his *Miranda* rights.[3] *Id.* at 28. Appellant wrote "[s]í" twice at the bottom

---

[3] Detective Fuentes testified that he read the entire form to Appellant in both English and Spanish. *Id.* at 92.

of the form in response to questions asking if he understood the rights read to him, and if with those "rights in mind, [he was] willing to talk with [the detectives] and give [them] a voluntary statement…." *Id.* at 28-29. After receiving his *Miranda* warnings, Appellant provided four more written statements to police between 2:10 p.m. and 7:52 p.m. *Id.* at 30, 33, 35. With each statement, Appellant admitted more culpability for the murder, eventually confessing to his full involvement in the victim's killing. Detective Nilsen testified that all of Appellant's statements were reduced to writing, reviewed by Appellant, and signed. *Id.* at 19, 21, 30, 33-34, 35. He further stated that Appellant's "demeanor never changed the entire day until we finally said good night to him. He was cooperative throughout." *Id.* at 29. The detective also commented that Appellant was "[f]riendly towards [the detectives]" and was offered bathroom breaks, food, and drinks throughout the day. *Id.* at 35. Detective Nilson testified that at no point did Appellant ever tell the detectives that he was tired, confused, or that he did not understand what he was doing. *Id.* at 36.

Based on the testimony of Detective Nilsen, as well as the other evidence presented by the Commonwealth, the trial court stated findings of fact at the conclusion of the suppression hearing. Pertinent to Appellant's issue on appeal, the court found that Appellant "clearly was not in custody when he was transported to the Upper Merion Police Department." *Id.* at 139. The court further found that Appellant was not in custody "when he

concluded the first phase of his interview" or "when he signed his rights form and acknowledged that he was giving up his constitutional rights." *Id.*

The record of the suppression hearing, summarized above, supports the court's factual finding that Appellant was not in custody when he made his first written statement to police, denying any involvement in the murder. Prior to that statement, Appellant voluntarily went with Detective Nilsen to the police station to answer some questions about the murder. He made the very short trip to the police station in the back of an unmarked SUV. He was not handcuffed or restrained in any way during the trip, or when he arrived at the police station. The interview occurred in an office and, before it began, Appellant was offered food, drink, and had the opportunity to use the restroom. He was informed that he was not under arrest and was free to leave. The conversation that ensued was cordial, and the detectives sought only basic biographical information from Appellant, and information pertaining to how he knew Delia and the victim. Nothing in the record suggests that the detectives showed, threatened, or used any type of force or coercive tactics when speaking with Appellant. Accordingly, the record supports the trial court's factual finding that Appellant was not in custody at the time he provided his first written statement to police.

After that statement, a short break was taken and Appellant was again asked if he needed anything, such as food or drink. When the questioning resumed, Appellant asked for an interpreter, and Detective Fuentes was immediately provided to translate. Appellant was still sitting in an office,

and was not restrained in any way. Again, nothing in the record suggests that the detectives used force, threats, or coercion when speaking with Appellant the second time. When Appellant was confronted with facts inconsistent to his initial statement, he made an inculpatory statement gratuitously, admitting that he hit the victim with a rock. Again, the record supports the trial court's finding that Appellant was not in custody at that point. Detective Nilsen immediately halted the interview and had Detective Fuentes provide Appellant with his ***Miranda*** rights in both English and Spanish. Appellant waived those rights, and does not challenge the validity of that waiver herein. Accordingly, Appellant's subsequent statements to police were properly admitted, and were not 'fruit of the poisonous tree,' as Appellant suggests. Thus, Appellant's first issue challenging the court's denial of his pretrial motion to suppress is meritless.

In Appellant's second issue, he contends that the court abused its discretion by imposing "consecutive sentences on the non-homicide charges." Appellant's Brief at 26. Appellant's claim challenges the discretionary aspects of his sentence.

> A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute. When challenging the discretionary aspects of the sentence imposed, an appellant must present a substantial question as to the inappropriateness of the sentence. Two requirements must be met before we will review this challenge on its merits. First, an appellant must set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence. Second, the appellant must show that there is a

substantial question that the sentence imposed is not appropriate under the Sentencing Code. That is, [that] the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process. We examine an appellant's [Pa.R.A.P.] 2119(f) statement to determine whether a substantial question exists. Our inquiry must focus on the *reasons* for which the appeal is sought, in contrast to the *facts* underlying the appeal, which are necessary only to decide the appeal on the merits.

*Commonwealth v. Ahmad*, 961 A.2d 884, 886-87 (Pa. Super. 2008) (citations, quotation marks and footnote omitted; emphasis in original).

Here, Appellant included a Rule 2119(f) statement in which he asserts that the court abused its discretion in sentencing him because it failed to consider information pertaining to Appellant's "history and characteristics … as well as his rehabilitative needs." Appellant's Brief at 17. Appellant further claims that the court "focused solely on the serious nature of the offense" and did not state sufficient reasons on the record for imposing "consecutive sentences to the [l]ife [imprisonment] sentence." *Id.* For these reasons, Appellant argues that his sentence is "manifestly unreasonable, unduly excessive and extremely vindictive." *Id.* at 18.

We need not decide whether these claims present substantial questions for our review because, even if they did, Appellant has waived them. "It is well settled that an [a]ppellant's challenge to the discretionary aspects of his sentence is waived if the [a]ppellant has not filed a post-sentence motion challenging the discretionary aspects with the sentencing court." *Commonwealth v. Bromley*, 862 A.2d 598, 603 (Pa. Super. 2004)

(citation omitted).[4]   Here, the only issue presented in Appellant's post-sentence motion was a claim that "the charges to which [Appellant] was found guilty were not separate and distinct incidents of criminality, but rather, one continuing course of criminal conduct."  Post-Sentence Motion, 4/1/14, at 2 (unnumbered).   Because Appellant did not raise the novel claims he asserts herein, *i.e.*, that the court failed to consider mitigating circumstances or state sufficient reasons on the record for imposing consecutive sentences, they are waived for our review.

We also note that even if Appellant had preserved these issues in his post-sentence motion, he did not raise them in his Rule 1925(b) statement and, thus, the trial court did not address them in its opinion.  Pa.R.A.P. 1925(b) Statement, 8/19/14, at 1 (challenging his sentence on the basis that "the evidence introduced at trial showed [Appellant's] actions to be a single criminal episode and not separate and distinct incidents of criminality"); TCO at 26-30 (addressing only Appellant's claim that

---

[4] ***See also Commonwealth v. Bullock***, 948 A.2d 818 (Pa. Super. 2008) (the right to appeal a discretionary aspect of sentence is not absolute and is waived if the appellant does not challenge it in post-sentence motions or by raising the claim during the sentencing proceedings); ***Commonwealth v. Lloyd***, 878 A.2d 867 (Pa. Super. 2005) (the appellant waived his challenge to his sentence where he failed to raise the issue at the sentencing hearing or in his post-sentence motion); ***Commonwealth v. Parker***, 847 A.2d 745 (Pa. Super. 2004) (the appellant's assertion that the trial court erred in sentencing him in the aggravated range is waived as he failed to raise this claim either at sentencing or in a post-sentence motion).

consecutive sentences were improper because his actions were "a single criminal episode and not separate and distinct incidents of criminality"). Accordingly, the sentencing claims Appellant asserts on appeal are waived on this basis, as well. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/3/2016