**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| OSCAR ALBERTO VEGA ALVARADO | |
| | No. 1692 EDA 2015 |

Appeal from the Order entered May 7, 2015,
in the Court of Common Pleas of Bucks County,
Criminal Division, at No(s): CP-09-CR-0000730-2015.

BEFORE:  OTT, RANSOM, and FITZGERALD,* JJ.

MEMORANDUM BY RANSOM, J.:                **FILED APRIL 28, 2017**

The Commonwealth appeals from the order entered May 7, 2015, granting Appellee's suppression motion.[1]  We affirm.

In November 2014, Appellee was arrested, and subsequently charged with driving under the influence pursuant to 75 Pa.C.S. §§ 3802(a)(1) and 3802(c).  On March 31, 2015, Appellee filed a pretrial motion, which included a challenge to the admissibility of statements he made during a traffic stop.  Specifically, Appellee contested the admissibility of his

_____

[1] The Commonwealth has certified that the trial court's suppression order will terminate and/or substantially handicap the prosecution of Appellant's case.  **See** Pa.R.A.P. 311(d).

*Former Justice specially assigned to the Superior Court.

statements made during a second interaction between him and the arresting officers on the basis that the statements were the product of a custodial interrogation made without **Miranda** warnings.[2]  Appellee also contested the admissibility of blood alcohol results on the basis that, without the statements he made at the scene, the Commonwealth was unable to establish the time of driving.

The trial court held a suppression hearing on May 7, 2015.  Trooper Craig Acord was the only witness.  In addition, the Commonwealth played the trooper's dash cam recording of the incident.  The trial court summarized its factual findings as follows:

> On November 21, 2014, at approximately 11:40 p.m., State Trooper [Craig] Acord ("Trooper Acord"), while on patrol and in full uniform, in a marked patrol vehicle, observed a disabled vehicle stopped on Interstate 95.  The disabled vehicle, a black Mercedes owned by [Appellee], was stopped on the right shoulder on Interstate 95 and had its hazard lights on.  Upon seeing the disabled vehicle, Trooper Acord turned on his overhead lights and stopped behind the vehicle.  It is Trooper Acord's practice to stop and offer assistance to disabled vehicles.
>
> When Trooper Acord initially parked his patrol car behind [Appellee's], he saw [Appellee] in the process of changing a tire.  Trooper Acord then got out of his patrol car, approached [Appellee] ("the first interaction"), and asked him questions assessing the situation and offering aid.  Trooper Acord's first two questions to [Appellee] were: "[Y]ou got a flat? You ok?"  Trooper Acord then asked [Appellee] where he was coming from and where he

---

[2] **Arizona v. Miranda**, 384 U.S. 436 (1966).

was going. Trooper Acord was very amicable during the first interaction. Prior to going back to his patrol vehicle, Trooper Acord told [Appellee] to "go ahead and do what you gotta do there" and to "have at it my friend." Pursuant to normal practice, Trooper Acord asked for [Appellee's] information and took his driver's license while his partner got the registration from [Appellee's] vehicle.

It is undisputed and uncontested that the first interaction between [Appellee] and Trooper Acord was a mere encounter. However, during the first interaction, Trooper Acord observed that [Appellee] appeared to be unsteady, slurred his speech, and had an odor of alcohol coming from him. These observations indicated to Trooper Acord, who has made roughly 350 DUI arrests, that [Appellee] was intoxicated ("hammered"). When Trooper Acord returned to his patrol car to run [Appellee's] driver's license and registration number, he notified his partner that [Appellee] was a "drunk driver" and that he was "hammered." Trooper Acord uses the term "hammered" when describing somebody who is "more than a little drunk." Trooper Acord then said to his partner that he was not going to let [Appellee] change his tire because he might hurt himself. At that time, Trooper Acord determined that [Appellee] was detained and no longer free to leave.

Trooper Acord then exited his patrol car and re-approached [Appellee's] vehicle a second time ("the second interaction"). When Trooper Acord approached [Appellee] for their second interaction, [Appellee] was kneeling down and changing the front right tire of his vehicle. When Trooper Acord reached [Appellee's] vehicle, he stated, "[Appellee], I want you to step over here and talk to me real quick." [Appellee] complied as ordered, and walked to the back right of his vehicle. [Appellee] then stood between the two State Troopers and the concrete barrier lining the shoulder of the highway.

Trooper Acord then proceeded to ask [Appellee] various questions which he already asked him during the first interaction. These questions called into doubt the answers [Appellee] initially provided. For example, one of the first questions Trooper Acord asked [Appellee] during the second interaction was "[w]here are you coming from?'

- 3 -

This same question was asked during the first interaction. However, it was now asked in an inquisitive tone of voice to communicate to [Appellee] that Trooper Acord severely doubted the answer [Appellee] had previously given. The same can be said for the way in which Trooper Acord re-asked [Appellee] "[h]ow come you're heading this way if you're heading home?

Trooper Acord then ordered [Appellee] to move, for a second time, between the patrol car and [Appellee's] car. Moments after commanding [Appellee] to step away from his front right tire, and asking various questions, Trooper Acord demanded [Appellee] "[s]tand over here and talk to me a bit more." This time, Trooper Acord made [Appellee] stand directly between the patrol car and [Appellee's] car. In doing so, Trooper Acord directed [Appellee] to "stand on that line for me and face me." Trooper Acord then asked [Appellee] "you don't have any weapon do you?" As Trooper Acord asked this question, he began to look into [Appellee's] pockets, asked what he was carrying and performed a brief pat down.

Trooper Acord then asked [Appellee] when his last drink was. [Appellee] responded that his last drink was twenty minutes prior to seeing Trooper Acord. Trooper Acord then asked [Appellee] if he stopped after work and where he stopped. [Appellee] answered in the affirmative and stated that he stopped at a bar called "The Press."

Trooper Acord then proceeded to administer a field sobriety test known as the horizontal gaze nystagmus. The test was administered to confirm that [Appellee] was intoxicated. The horizontal gaze nystagmus test did in fact indicate that [Appellee] was intoxicated. Next, Trooper Acord had [Appellee] take a portable breath test. The portable breath test measured [Appellee's] blood alcohol level at .19, more than double the legal limit. Trooper Acord then handcuffed [Appellee] and placed him in the back of his patrol car.

Trooper Acord testified at the suppression hearing that his plan in re-approaching [Appellee] was to build his case for impairment. Trooper Acord hoped to do so by getting [Appellee] to talk more so that he could get [Appellee's] slurred speech on his audio recorder. However, Trooper

Acord did not provide [Appellee] with his *Miranda* warnings. Further, at no point did Trooper Acord or his partner return [Appellee's] driver's license to him.

Earlier in the evening, another State Trooper, Trooper Hand, observed [Appellee] pull over to the side of the highway. No estimate of time between [Trooper] Hand's observation and when Trooper Acord arrived on the scene was given. [Appellee] was not in the driver's seat and the engine was not running. Trooper Acord did not touch any portion of the vehicle to indicate whether or not it was warm. At approximately 12:30 a.m. blood was drawn at St. Mary's Hospital.

Trial Court Opinion, 10/7/15, at 1-5 (footnotes omitted).

After hearing argument from the parties, the trial court granted Appellee motion, thereby suppressing statements made during the second interaction, and, because the Commonwealth proof of the time Appellee was driving was dependent on one of these statements, it also ruled the blood alcohol results inadmissible as it relates to the Section 3802(c) charge. This timely appeal by the Commonwealth follows. Both the Commonwealth and the trial court have complied with Pa.R.A.P. 1925.

The Commonwealth raises the following issues:

A. Did [Trooper Acord] have reasonable suspicion to believe that Appellee, who exhibited slurred speech and red, glassy eyes, smelled of alcohol, was unsteady on his feet, and had trouble responding to the [trooper's] questions, had been operating his vehicle while under the influence of alcohol, such that an investigative detention of Appellee was lawful for purposing [sic] of further investigation [of] the suspected criminal activity?

B. Did the suppression court err in concluding that Appellee had been subject to custodial interrogation which required *Miranda* warnings where the [trooper]

- 5 -

testified that he formed the opinion during the traffic stop that Appellee was intoxicated and therefore not free to leave but where the [trooper] never communicated that to Appellee, and where, under an objective standard, the totality of the circumstances did not reasonably suggest to Appellee that he was under arrest or the [functional] equivalent thereof at the time he made statement(s) that were the subject of suppression?

C. Did the suppression court err in suppressing the laboratory results concerning Appellee's blood alcohol content based on a violation of the two-hour rule where it held that there was circumstantial evidence that Appellee had been driving within two hours of his blood being drawn based on Appellee's statements in conjunction with other circumstantial evidence, but that Appellee's statement was inadmissible and therefore the blood results were inadmissible?

D. Did the suppression court err in suppressing the laboratory results concerning Appellee's blood alcohol content based on a violation of the two-hour rule where the blood alcohol results were otherwise admissible as evidence on count one of the information, 75 Pa.C.S. § 3802(a)(1), irrespective of whether Appellee's blood was drawn within two hours of him operating a vehicle?

Commonwealth's Brief at 4-5 (excess capitalization omitted).

This Court has summarized:

The applicable standard of review in a Commonwealth appeal from an order of suppression is well-settled. We must first determine whether the factual findings are supported by the record, and then determine whether the inferences and legal conclusions drawn from those findings are reasonable. We may consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. When the evidence supports the suppression court's findings of fact, this Court may reverse only when the legal conclusions drawn from those facts are erroneous.

- 6 -

***Commonwealth v. Lyles***, 54 A.3d 76 (Pa. Super. 2012) (citations omitted), ***affirmed***, 97 A.3d 298 (Pa. 2014).

After careful review of the suppression hearing transcript, as well as our viewing of the dash cam video, we conclude that the Honorable Robert J. Mellon has prepared a thorough and well-reasoned opinion that discusses the different types of police interaction with persons subject to a traffic stop and correctly applies the requisite quantum of evidence the police must possess in order to validate their conduct. Applying the applicable criteria to his factual findings, we conclude that Judge Mellon has correctly disposed of the Commonwealth's first three claims. We therefore adopt Judge Mellon's October 7, 2015 opinion as our own in disposing of the Commonwealth's first three issues enumerated above.

In reaching our conclusion, we reiterate that standards applicable to police conduct may change during the relatively short duration of a traffic stop. ***See Commonwealth v. Cauley***, 10 A.3d 321, 326 (Pa. Super. 2010) (explaining that "[b]ecause the level of intrusion may change during the course of the police encounter, the record must be carefully scrutinized for any evidence of such changes"). Given the particular facts presented, we emphasize the following rationale provided by Judge Mellon:

> The foregoing facts clearly indicate that no further investigation was necessary to convince Trooper Acord, who has made roughly 350 DUI arrests, that [Appellee] was intoxicated and an arrest was going to be made. For instance, Trooper Acord's use of the word "hammered," and his corresponding description of the term, showed that

there was no doubt in his mind that [Appellee] was intoxicated. Trooper Acord testified at the suppression hearing that his plan in re-approaching [Appellee] was to build his case for impairment. His only efforts in doing so were to ask incriminating questions and subject [Appellee] to an interrogation. These circumstances do not fit the purpose of the investigative detention because once the determination to arrest was made, [Appellee] was in custody and entitled to his **Miranda** warnings prior to being interrogated.

Trial Court Opinion, 10/7/15, at 24 (footnote omitted). **See**, **e.g.**, **Commonwealth v. Turner**, 772 A.2d 970, 975 (Pa. Super. 1999) (*en banc*) (holding that if a motorist who has been detained pursuant to a traffic stop thereafter is subject to treatment that renders him in custody for practical purposes, he or she is entitled to full panoply of protections prescribed by **Miranda**).

In addressing the Commonwealth's fourth issue, we note that Judge Mellon explicitly suppressed the blood alcohol results only as to the Section 3802(c) charge. **See** Trial Court Opinion, 10/7/15, at 26.

In sum, because a review of the totality of the circumstances supports the conclusion that Appellee was subject to custodial interrogation during the traffic stop without the benefit of **Miranda** warnings, we affirm the order granting Appellee's suppression motion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/28/2017</u>

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
## CIVIL ACTION

COMMONWEALTH OF PENNSYLVANIA :
:
vs. :
: CP-09-CR-000730-2015
OSCAR VEGA ALVARADO :
:

## OPINION

The Commonwealth of Pennsylvania (the "Commonwealth") appeals from the decision of this Court's Order entered on May 7, 2015, granting Oscar Vega Alvarado's ("Alvarado" or "Mr. Vega") Motion to Suppress statements he made after he was subject to a custodial interrogation but not provided with his Miranda warnings. It is uncontested that the initial interaction between Trooper Acord and Alvarado was a "mere encounter." However, the primary issue before this Court is whether the second interaction between Trooper Acord and Alvarado was a custodial interrogation which required Miranda warnings.

## FACTUAL AND PROCEDURAL BACKGROUND

On, November 21, 2014 at approximately 11:40 p.m., State Trooper Craig Acord ("Trooper Acord"), while on patrol and in full uniform, in a marked patrol vehicle, observed a disabled vehicle stopped on Interstate 95.[1] The disabled vehicle, a black Mercedes owned by Alvarado, was stopped on the right shoulder on Interstate 95 and had its hazard lights on.[2] Upon seeing the disabled vehicle, Trooper Acord turned on his overhead lights and stopped behind the vehicle.[3] It is Trooper Acord's practice to stop and offer assistance to disabled vehicles.[4]

---

[1] Notes of Testimony (hereinafter "N.T.") 5/7/15, 15:1-3.
[2] N.T. 5/7/15, 21-23.
[3] N.T. 5/7/15, 16:6-13.
[4] N.T. 5/7/15, 21-23. Trooper Acord testified at the suppression hearing that it is normal practice for Trooper Acord and other State Troopers to offer aid to drivers of disabled vehicles. Trooper Acord testified that if the driver of the

When Trooper Acord initially parked his patrol car behind Alvarado's, he saw Alvarado in the process of changing a tire.[5] Trooper Acord then got out of his patrol car, approached Alvarado ("the first interaction"), and asked him questions assessing the situation and offering aid.[6] Trooper Acord's first two questions to Alvarado were: "[y]ou got a flat? You ok?"[7] Trooper Acord then asked Alvarado where he was coming from and where he was going.[8] Trooper Acord was very amicable during the first interaction. Prior to going back to his patrol vehicle, Trooper Acord told Alvarado to "go ahead and do what you gotta do there" and to "have at it my friend."[9] Pursuant to normal practice, Trooper Acord asked for Alvarado's information and took his driver's license while his partner got the registration from Alvarado's vehicle.[10]

It is undisputed and uncontested that that the first interaction between Alvarado and Trooper Acord was a mere encounter. However, during the first interaction, Trooper Acord observed that Alvarado appeared to be unsteady, slurred his speech, and had an odor of alcohol coming from him.[11] These observations indicated to Trooper Acord, who has made roughly 350 DUI arrests, that Alvarado was intoxicated ("hammered").[12] When Trooper Acord returned to his patrol car to run Alvarado's driver's license and registration number, he notified his partner that Alvarado was a "drunk driver"[13] and that he was "hammered."[14] Trooper Acord uses the term "hammered" when describing somebody who is "more than a little drunk."[15] Trooper Acord then

---

disabled vehicle does need assistance, the State Trooper will call a tow truck, otherwise the Trooper will set up flares behind the driver's vehicle to protect them from traffic.

[5] N.T. 5/7/15, 16:22-25.

[6] Video.

[7] Video.

[8] Video.

[9] Video.

[10] N.T. 5/7/15, 17-18.

[11] N.T. 5/7/15, 18:10-17.

[12] N.T. 5/7/15, 18-19.

[13] Video.

[14] N.T. 5/7/15, 20:1-10.

[15] N.T. 5/7/15, 30:7-9.

2

said to his partner that he was not going to let Alvarado change his tire because he might hurt himself.[16] At that time, Trooper Acord determined that Alvarado was detained and no longer free to leave.[17]

Trooper Acord then exited his patrol car and re-approached Alvarado's vehicle a second time ("the second interaction").[18] When Trooper Acord approached Alvarado for their second interaction, Alvarado was kneeling down and changing the front right tire of his vehicle.[19] When Trooper Acord reached Alvarado's vehicle, he stated, "Mr. Vega, I want you to step over here and talk to me real quick."[20] Alvarado complied as ordered, and walked to the back right of his vehicle.[21] Alvarado then stood between the two State Troopers and the concrete barrier lining the shoulder of the highway.[22]

Trooper Acord then proceeded to ask Alvarado various questions which he already asked him during the first interaction.[23] These questions called into doubt the answers Alvarado initially provided. For example, one of the first questions Trooper Acord asked Alvarado during the second interaction was "[w]here are you coming from?"[24] This same question was asked during the first interaction.[25] However, it was now asked in an inquisitive tone of voice to communicate to Alvarado that Trooper Acord severely doubted the answer Alvarado had previously given.[26] The

---

[16] N.T. 5/7/15, 20:14-18.
[17] N.T. 5/7/15, 32:4-14.
[18] N.T. 5/7/15, 20:18-19.
[19] Video.
[20] Video.
[21] Video
[22] Video.
[23] Video.
[24] Video.
[25] Video.
[26] Video.

3

same can be said for the way in which Trooper Acord re-asked Alvarado "[h]ow come you're heading this way if you're heading home?"[27]

Trooper Acord then ordered Alvarado to move, for a second time, between the patrol car and Alvarado's car.[28] Moments after commanding Alvarado to step away from his front right tire, and asking Alvarado various questions, Trooper Acord demanded Alvarado "[s]tand over here and talk to me a little bit more."[29] This time, Trooper Acord made Alvarado stand directly between the patrol car and Alvarado's car.[30] In doing so, Trooper Acord directed Alvarado to "stand on that line for me and face me."[31] Trooper Acord then asked Alvarado "you don't have any weapon do you?" As Trooper Acord asked this question, he began to look into Alvarado's pockets, asked what he was carrying, and performed a brief pat down.[32]

Trooper Acord then asked Alvarado when his last drink was.[33] Alvarado responded that his last drink was twenty minutes prior to seeing Trooper Acord.[34] Trooper Acord then asked Alvarado if he stopped after work and where he stopped.[35] Alvarado answered in the affirmative and stated that he stopped at a bar called "The Press."[36]

Trooper Acord then proceeded to administer a field sobriety test known as the horizontal gaze nystagmus.[37] The test was administered to confirm that Alvarado was intoxicated.[38] The

---

[27] Video. The patrol video in this case indicates that Alvarado told Trooper Acord he was going home. However, after viewing Alvarado's address on his driver's license, Trooper Acord questioned Alvarado why he was stopped at a certain point on the highway if he lived at the address listed on his driver's license? Mainly, Trooper Acord believed that Alvarado missed his exit, and questioned him to that effect.
[28] Video.
[29] Video.
[30] Video.
[31] Video.
[32] Video.
[33] N.T. 5/7/15, 23-24.
[34] N.T. 5/7/15, 24:1-3.
[35] N.T. 5/7/15, 34-35.
[36] N.T. 5/7/15, 24: 7-10.
[37] N.T. 5/7/15, 21-22.
[38] N.T. 5/7/15, 21-22.

4

horizontal gaze nystagmus test did in fact indicate that Alvarado was intoxicated.[39] Next, Trooper Acord had Alvarado take a portable breath test.[40] The portable breath test measured Alvarado's blood alcohol level at .19, more than double the legal limit.[41] Trooper Acord then handcuffed Alvarado and placed him in the back of his patrol car.[42]

Trooper Acord testified at the suppression hearing that his plan in re-approaching Alvarado was to build his case for impairment.[43] Trooper Acord hoped to do so by getting Alvarado to talk more so that he could get Alvarado's slurred speech on his audio recorder.[44] However, Trooper Acord did not provide Alvarado with his Miranda warnings.[45] Further, at no point did Trooper Acord or his partner return Alvarado's driver's license to him.[46]

Earlier in the evening another State Trooper, Trooper Hand, observed Alvarado pull over to the side of the highway.[47] No estimate of the time between Tooper Hand's observation and when Trooper Acord arrived on the scene was given. Alvarado was not in the driver's seat and the engine was not running.[48] Trooper Acord did not touch any portion of the vehicle to indicate whether or not it was warm.[49] At approximately 12:30 a.m. blood was drawn at St. Mary's Hospital.[50]

Alvarado is charged on Criminal Information No. 730-2015 with Driving Under the Influence, 75 Pa. C.S. § 3802(a)(1) & (c).

---

[39] N.T. 5/7/15, 22-23.
[40] N.T. 5/7/15, 23:6-9.
[41] N.T. 5/7/15, 23:6-9.
[42] Video.
[43] N.T. 5/7/15, 20-21.
[44] Id.
[45] N.T. 5/7/15, 52:1-6.
[46] Video.
[47] N.T. 5/7/15, 44-48.
[48] N.T. 5/7/15, 49:19-21.
[49] N.T. 5/7/15, 49:21-25.
[50] N.T. 5/7/15, 27:12-19.

5

On March 31, 2015, Alvarado filed a pretrial motion, which included his challenge to the admissibility of his statements made at the scene of the traffic stop. Specifically, Alvarado contested the admissibility of his statements made during the second interaction on the basis that they were a product of a custodial interrogation and made without Miranda warnings. Alvarado similarly contested the admissibility of the Blood Alcohol Results on the basis that without the statements Alvarado made on scene, the Commonwealth was unable to establish the time of driving.

During a suppression hearing on May 7, 2015, the Court Granted Alvarado's Motion to Suppress and suppressed statements made at the scene of the vehicle stop and therefore ruled that the Blood Alcohol Results were also inadmissible.[51]

On June 5, 2015, the Commonwealth filed a Notice of Appeal with the Superior Court. This Opinion is filed pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).[52]

## STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), the Commonwealth filed a Statement of Errors Complained of on Appeal on June 30, 2015. In its appeal, the Commonwealth complained of four errors. This Court consolidates these four complained of errors into following two issues:

1. Was Alvarado deprived of his Constitutional rights when Trooper Acord did not provide him Miranda warnings before or during the second time Trooper Acord approached Alvarado and his vehicle such that any statement made by Alvarado during this second interaction should be suppressed?

---

[51] N.T. 5/7/15, 73-75.
[52] "Rule 1925 is intended to aid trial judges in identifying and focusing upon those issues which the parties plan to raise on appeal. Rule 1925 is thus a crucial component of the appellate process." Com. v. Seibert, 799 A.2d 54, 62 (Pa. Super. 2002).

6

2. If Alvarado's Constitutional rights were violated because Trooper Acord failed to provide him Miranda warnings before or during their second interaction, should the blood alcohol results, taken at Saint Mary's Hospital, be suppressed as a product of an unlawful detainment, violation of Miranda warnings, and in violation of the two hour rule?

## DISCUSSION

This Court will discuss the aforementioned issues in turn. As previously stated, it is uncontested and undisputed that the first interaction between Alvarado and Trooper Acord was a mere encounter. Therefore, this Court needs only to analyze whether Alvarado's Constitutional rights were violated during the second interaction.

The first Section of this Opinion will begin by discussing the three types of interactions between law enforcement and citizens and the corresponding legal standards. This Opinion will then illustrate why the second interaction rose to the level of a custodial interrogation. Accordingly, this Opinion will show that Alvarado was entitled to his Miranda warnings during the second interaction. Because Alvarado was not given his Miranda warnings, any statement made during the second encounter will be suppressed.

In the second Section, this Opinion will discuss why the blood alcohol results taken at Saint Mary's Hospital were the product of a violation of Alvarado's Constitutional rights. Consequently, the Blood Alcohol Results should also be suppressed.

I. **Trooper Acord's Second Interaction with Alvarado Constituted a Custodial Interrogation Such That Alvarado Should Have Been Given _Miranda_ Warnings and, Because of Trooper Acord's Failure To Provide Such Warnings, Alavarado's Statements During the Second Interaction Are Suppressed.**

The Fourth Amendment of the United States Constitution provides that it is "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

7

and seizures . . . "[53] Similarly, the Pennsylvania Constitution guarantees that the people of the Commonwealth "shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures . . . "[54] "The Fourth Amendment protects against unreasonable searches and seizures, including those entailing only a brief detention."[55] Courts have divided interactions between law enforcement and citizens into three categories. These categories provide varying levels of justification depending upon the nature of the interaction and whether or not the citizen is detained.[56]

> The first of these is a "**mere encounter**" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "**investigative detention**" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "**custodial detention**" must be supported by probable cause.[57]

However, the type of encounter can change during the course of the interaction.[58]

### A. Mere Encounter

A law enforcement agent may engage in a mere encounter without any suspicion of criminal activity, and the citizen has no obligation to stop or respond.[59] "A mere encounter is characterized by limited police presence and police conduct and questions that are not suggestive of coercion. It is only when such police presence becomes *too* intrusive, the interaction must be

---

[53] U.S. Const. amend IV.
[54] Pa. Const. art. I, § 8.
[55] Com. v. Strickler, 757 A.2d 884, 887 (Pa. 2000).
[56] Com v. DeHart, 745 A.2d 633, 636 (Pa. Super. 2000).
[57] Com. v. Fleet, 114 A.3d 840, 845 (Pa. Super. 2015).
[58] Com. v. Blair, 860 A.2d 567, 572 (Pa. Super. 2004)(holding that "[b]ecause the level of intrusion into a person's liberty may change during the course of the encounter, [courts] must carefully scrutinize the record for any evidence of such changes.").
[59] Com v. Boswell, 721 A.2d 336, 340 (Pa. 1998).

deemed an investigative detention or seizure."[60] "The hallmark of [a mere encounter] is that it carries no official compulsion to stop of respond."[61]

Police officers lending aid to citizens has been classified as a mere encounter. "[The Superior Court of Pennsylvania] has held that police officers have a duty to render aid and assistance to those they believe are in need of help."[62] For example, in Commonwealth v. Kendall, the court ruled that there was just a mere encounter when a police officer pulled off a road, behind a vehicle, and was just trying to determine whether a motorist needed aid.[63]

Similarly, in Commonwealth v. Collins, a State Trooper approached a vehicle parked after dark, at a scenic location that was commonly used in daylight, to check on the safety of the motorists.[64] The trooper parked twenty feet away from the rear of the vehicle, observed no outward sign of distress from the vehicle or its occupants, did not observe anything that would lead him to believe illegal activity was occurring, and the occupants of the vehicle were not scrambling around as if they were trying to get away because the trooper was approaching.[65] However, when the trooper approached the vehicle, he smelled marijuana and saw a bong in plain view.[66] Thereafter, an occupant of the vehicle blurted out that the occupants had been smoking marijuana and that he owned the bong.[67]

The defendant was charged with possession of drug paraphernalia and moved to suppress the drug paraphernalia (i.e. the bong).[68] Ultimately, the court denied the defendant's Motion to Suppress and held that the initial interaction between the State Trooper and the passenger in the

---

[60] Com. v. Hill, 874 A.2d 1214, 1220–21 (Pa. Super. 2005)(citations omitted)(emphasis in original).
[61] DeHart, 745 A.2d at 636.
[62] Com v. Kendall, 976 A.2d 503, 505 (Pa. Super. 2009).
[63] Kendall, 976 A.2d at 505.
[64] Com. v. Collins, 950 A.2d 1041, 1044 (Pa. Super. 2008).
[65] Collins, 950 A.2d at 1045–46.
[66] Id.
[67] Id. at 1045.
[68] Id.

9

vehicle was a mere encounter that did not need to be supported by any level of suspicion.[69] The court reasoned that the State Trooper did not act in a coercive manner, did not speak forcefully to the defendant, and that a reasonable person in the defendant's position would have interpreted the trooper's actions "as an act of official assistance and not an investigative detention."[70]

However, as previously stated, the conduct of the law enforcement agent can escalate the type of interaction. "If the police action becomes too intrusive, a mere encounter may escalate into an investigatory stop or a seizure."[71]

## B. Investigative Detention

In contrast to a mere encounter, an investigative detention "carries an official compulsion to stop and respond, *but the detention is temporary*, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest."[72] However, because the investigative detention has the elements of official compulsion, it requires "reasonable suspicion" of unlawful activity.[73] The Pennsylvania Supreme Court enunciated the test to determine whether individuals interacting with police officers have been subject to an "investigative detention."[74] "The test is whether, considering all the circumstances surrounding the encounter, the police conduct would communicate to a reasonable person that the person was not free to decline the officers' request or otherwise terminate the encounter."[75]

The purpose of an investigative detention is to provide law enforcement an opportunity to conduct further investigation into suspected criminal activity. For example, in Commonwealth v.

---

[69] Id. at 1047–48.
[70] Id. at 1047.
[71] Boswell, 721 A.2d 336, 340 (Pa. 1998); see also Blair, 860 A.2d 567, 572 (Pa. Super. 2004)(ruling that "[b]ecause the level of intrusion into a person's liberty may change during the course of the encounter, we must carefully scrutinize the record for any evidence of such changes.").
[72] DeHart, 745 A.2d 633, 636 (Pa. Super. 2000)(emphasis added).
[73] Id.
[74] Com. v. Sierra, 723 A.2d 650 (Pa. 1999).
[75] DeHart, 745 A.2d 633, 636 (Pa. Super. 2000)(citing Sierra, 723 A.2d 650 (Pa. 1999)).

10

DeHart, the court analyzed when interactions escalate into an investigative detention.[76] The applicable facts for DeHart are as follows: two State Troopers, were on patrol in two marked patrol vehicles when they received a radio report that there was a "suspicious vehicle" that might be a blue Camaro or Trans Am.[77] The Troopers then briefly followed a Trans Am that was driving slowly.[78] The Trooper later found the Trans Am parked in the front of a house with the engine still running.[79]

The Troopers pulled their car up next to and on the left hand side of the Trans Am.[80] The Trooper sitting in the passenger seat then rolled his window down; this prompted the driver of the Trans Am to do the same.[81] The Trooper then asked the driver of the Trans Am "what's going on here?"[82] The driver of the Trans Am responded in a soft-spoken manner and avoided eye contact with the Trooper.[83] This aroused suspicions for the questioning Trooper who said to his partner, "something's not right here, . . . I'm going to get out of the car and see what's going on here."[84]

The Troopers proceeded to exit their patrol car. One Trooper went to speak with the driver of the Trans Am while the other Trooper spoke with the passenger.[85] After conversing with the driver of the Trans Am, the Trooper smelled alcohol on his breath and believed he might not be twenty-one years of age.[86] The driver provided the Trooper with his driver's license which

---

[76] DeHart, 745 A.2d 633, 635 (Pa. Super. 2000).
[77] Id.
[78] Id.
[79] Id.
[80] Id.
[81] Id.
[82] Id.
[83] Id.
[84] Id.
[85] Id.
[86] Id.

11

confirmed he was under twenty-one years of age.[87] The Trooper then directed the driver out of his vehicle.[88]

Meanwhile, the other Trooper also detected alcohol on the breath of the passenger.[89] The Trooper then asked the passenger to exit the vehicle and told he was going to be transported to Evangelical Hospital.[90] The Trooper also performed a pat-down search on the passenger.[91] The pat-down yielded a marijuana pipe and a bag of marijuana.[92] Both the passenger and the driver of the Trans Am were arrested and taken to the hospital for blood alcohol tests.[93] Charges were filed against both parties and both parties moved to suppress all of the evidence resulting from the police encounter.[94]

The court held that the Troopers pulling up to the Trans Am and making cursory inquiries qualified as a mere encounter.[95] The court justified this finding on the fact that the Troopers just wanted to find out what was going on.[96] However, the court ruled that when the Troopers exited the vehicle and approached the Trans Am, they escalated "the encounter to afford greater investigation, which, of course, is consistent with the **purpose** of an investigative detention."[97] Accordingly, the court analyzed whether the Troopers had the requisite reasonable suspicion of criminal activity to support the investigative detention.[98]

---

[87] Id.
[88] Id.
[89] Id.
[90] Id.
[91] Id.
[92] Id.
[93] Id.
[94] Id.
[95] Id. at 638.
[96] Id.
[97] Id. (emphasis added).
[98] Id. at 637-38.

12

## C. Custodial Detention and Custodial Interrogation

The final kind of interaction is a custodial detention. "In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest."[99] "The key distinction between an investigative detention and custodial detention is that an investigative detention lacks the coercive conditions that would make it the functional equivalent of an arrest."[100] However, the facts and circumstances of each case are generally controlling in determining whether or not a detention is investigatory or custodial.

In determining whether or not a person was entitled to <u>Miranda</u> warnings, courts must first determine if that person was subject to a custodial interrogation.[101] The standard Pennsylvania courts use in determining whether a person's interaction with law enforcement is "custodial," or whether law enforcement initiated a "custodial interrogation," is an objective one based on a totality of the circumstances with due consideration given to the reasonable impression conveyed to the person interrogated.[102] Custodial interrogation, which ultimately require <u>Miranda</u> warnings, is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[103] The applicable test for determining whether a particular situation involves a custodial interrogation is as follows:

> The test for determining whether a suspect is being subjected
> to custodial interrogation so as to necessitate *Miranda* warnings is
> whether he is physically deprived of his freedom in any significant
> way or is placed in a situation in which he reasonably believes that

---

[99] <u>Id.</u> (citations omitted).
[100] <u>Walkden v. Com., Dept. of Transp., Bureau of Driver Licensing</u>, 103 A.3d 432, 439 (Pa. Commw. Ct. 2014).
[101] <u>Com. v. Johnson</u> 541 A.2d 332, 336 (Pa. Super. 1988)(holding that "[a] person must be informed of his or her Miranda rights prior to custodial interrogation by police.").
[102] <u>Com v. Gwynn</u>, 723 A.2d 143, 148 (Pa. 1998).
[103] <u>Johnson</u>, 541 A.2d at 336 (quoting <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966)).

13

his freedom of action or movement is restricted by such interrogation.[104]

Simply put, determining whether a situation is a "custodial interrogation" is a two-part test. First, the court must determine if the detention is "custodial." Then the court must determine whether the conduct by law enforcement qualifies as "interrogation."

Law enforcement "detentions in Pennsylvania become **custodial** when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest."[105] The applicable standard for determining whether a detention is custodial is an objective one based on the totality of the circumstances.[106] The terms "arrest and "custodial detention" have been used interchangeably.[107] An arrest is defined as:

> [a]ny act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest.... The test is an objective one, i.e., viewed in the light of the reasonable impression conveyed to the person subjected to the seizure rather than the strictly subjective view of the officers or the persons being seized.[108]

"[A] reviewing court is to consider the particular facts of each case in order to determine whether a detention is custodial."[109]

"**Interrogation**" is police conduct "calculated to, expected to, or likely to evoke admission."[110] "Interrogation occurs where the police should know that their words or actions are

---

[104] Com v. Busch, 713 A.2d 97, 100 (Pa. Super. 1998)(citations omitted).
[105] Com v. Mannion, 725 A.2d 196, 200 (Pa. Super. 1999)(emphasis added).
[106] Walkden, 103 A.3d 432, 439 (Pa. Commw. Ct. 2014).
[107] Fleet, 114 A.3d at 845.
[108] Com v. Butler, 729 A.2d 1134, 1137 (Pa. Super. 1999).
[109] Id.
[110] Id. (citations omitted)(emphasis added).

14

reasonably likely to elicit an incriminating response from the suspect."[111] If a person is both in custody and underwent to an interrogation during that time, courts will find that he or she was subject to a custodial interrogation.

Once it has been determined that the person was subject to a custodial interrogation, the court will look to see if the law enforcement agent properly provided the arrestee with Miranda warnings. The United States Supreme Court has explained that "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."[112] "The principles surrounding Miranda warnings are also well settled. The prosecution may not use statements stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel."[113] "Unless a person is advised of his Miranda rights prior to custodial interrogation by law enforcement officers in a criminal proceeding, evidence resulting from such interrogation cannot be used against him."[114]

## ANALYSIS

In the first Part of this Section, this Court will first discuss how any why, during the second interaction, Alvarado was in custody. Then, this Court will examine why Trooper Acord's questions were incriminating in nature and, thus, Alvarado was subject to custodial interrogation. Because Alvarado was subject to a custodial interrogation during the second interaction, he was entitled to Miranda warnings. Thus, because Alvarado was not provided Miranda warnings, all statements made during the second interaction must be suppressed. Lastly, this Court will discuss

---

[111] Gwynn, 723 A.2d at 149.
[112] Rhode Island v. Innis, 446 U.S. 291, 301–302 (1980).
[113] Com. v. Gaul, 912 A.2d 252, 255 (Pa. 2006).
[114] In Interest of Mellott, 476 A.2d 11, 13 (Pa. Super. 1984)(citations omitted).

15

why the Commonwealth's argument, that the second interaction was an investigatory detention, fails.

In the second Part of this Section, this Court discuss the admissibility of the Blood Alcohol Results taken at Saint Mary's Hospital. Ultimately the second Part of this Section will state that the results are suppressed because they were a product of an unlawful detainment, in violation of Alvorado's Miranda rights, and in violation of the two hour rule.

1. **The Second Interaction Between Trooper Acord and Alvarado Was a Custodial Interrogation Which Required Miranda Warnings and, Because Trooper Acord Failed to Provide Miranda Warnings, Any of Alvarado's Statements Made During the Second Interaction Are Suppressed.**

Trooper Acord made the decision to arrest Alvarado prior to initiating the second interaction.[115] Trooper Acord expressed to Alvarado his decision to arrest him by the manner in which Trooper Acord conducted himself, the tenor of his questions and tone of his voice, and manner in which he asked the questions during the second interaction. Knowing that Alvarado was not free to leave, and portraying this to Alvarado, Trooper Acord proceeded to ask Alvarado incriminating questions. Accordingly, Alvarado was entitled to his Miranda warnings because he was (a) in custody and (b) asked incriminating questions. Because he was not provided his Miranda warnings, any statements made during the second interaction are suppressed.

a. **Alvarado Was in Custody During the Second Interaction.**

In analyzing the particular facts of this case, it is clear that the second interaction was a custodial detention because Alvarado was "taken into custody [and] otherwise deprived of his freedom of action in [a] significant way."[116] In applying the objective standard for determining

---

[115] N.T. 5/7/15, 32:4-14.
[116] Johnson 541 A.2d at 336 (quoting Miranda, 384 U.S at 444; see also Mannion, 725 A.2d 196, 200 (Pa. Super. 1999)(noting that "a reviewing court is to consider the particular facts of each case in order to determine whether a detention is custodial.").

16

whether Alvarado's second interaction with Trooper Acord was "custodial," based on the totality of the circumstances, it is clear that the reasonable impression conveyed to Alvarado was that he was under arrest.[117]

Trooper Acord knew that Alvarado was detained during the second interaction and communicated this to Alvarado. At the suppression hearing, regarding the second interaction, Trooper Acord testified as follows:

> Q: Okay. So you've have this minor encounter with [Alvarado]. You've asked him some pretty innocuous questions. You get back in your car, and that moment while you're in your patrol car you say to your fellow officer he's hammered, right?
> A: Yes[118]
>
> Q: In your opinion, as of that moment if Mr. Alvarado wanted to walk away and just keep walking, would you have stopped him?
> A: Yes.[119]
>
> Q: If Mr. Alvarado had the ability to get back in his car and drive away, would you have prevented him from doing that?
> A: Yes.[120]
>
> Q: So at that moment, after you determined that he was hammered, Mr. Alvarado was no longer free to leave, correct?
> A: That's correct . . . He was not free to leave.[121]
>
> Q: [] You already formed the opinion when you got out of your patrol car the second time that that man was not free to leave, either on foot or by vehicle, correct?
> A: That's correct.[122]
>
> Q: So, in essence, he was detained, correct?
> A: When I re-approached him?
> Q: Yes.
> A: And I began to question him again?
> Q: Yes.

---

[117] See Gwynn, 723 A.2d at 148 (ruling that the standard Pennsylvania courts use in determining whether a person's interaction with law enforcement is "custodial," or whether law enforcement initiated a "custodial interrogation," is an objective one based on a totality of the circumstances with due consideration given to the reasonable impression conveyed to the person interrogated).

[118] N.T. 5/7/15, 30:12-17

[119] N.T. 5/7/15, 30: 18-21.

[120] N.T. 5/7/15, 30: 22-25

[121] N.T. 5/7/15, 31: 1-13.

[122] N.T. 5/7/15, 31-32.

17

A: At that point he was detained, yes.

Q: He was detained. Not free to leave.

A: He was not free to leave no.

Q: And if he tried to walk away you would have stopped him?

A: Absolutely. [123]

From his testimony, it is clear that Trooper Acord knew that Alvarado was detained during his second interaction with Trooper Acord.

Trooper Acord expressed to Alvarado his decision to arrest him by the manner in which Trooper Acord conducted himself, the tenor of his questions and tone of his voice, and manner in which he asked the questions during the second interaction. The evidence shows that Alvarado knew he was detained from the actions of Trooper Acord. "[U]nder the totality of the circumstances, the conditions . . . of the detention [during the second interaction became] so coercive as to constitute the functional equivalent of arrest."[124]

Trooper Acord expressed to Alvarado his decision that Alvarado was under arrest by the way he conducted himself.[125] For example, when Trooper Acord approached Alvarado for their second interaction, Alvarado was kneeling down and changing his front right tire.[126] As he approached Alvarado's vehicle, the first thing that Trooper Acord said was, "Mr. Vega, I want you to step over here and talk to me real quick."[127] In essence, Trooper Acord commanded Alvarado to stop changing his tire, stand behind the back rear of his vehicle, and between two State Troopers and the concrete barrier on the shoulder of the highway.[128] Trooper Acord then proceeded to ask

---

[123] N.T. 5/7/15, 32: 4-14.

[124] Mannion, 725 A.2d at 200 (emphasis added).

[125] See Gwynn, 723 A.2d at 148 (holding that the standard Pennsylvania courts use in determining whether a person's interaction with law enforcement is "custodial," or whether law enforcement initiated a "custodial interrogation," is an objective one based on a totality of the circumstances with due consideration given to the reasonable impression conveyed to the person interrogated).

[126] Video.

[127] Video.

[128] Video.

Alvarado various questions which he already answered, now calling into doubt the answers Alvarado initially provided.[129]

Moments after commanding that Alvarado step away from his front right tire, and asking Alvarado various questions, Trooper Acord demanded Alvarado "[s]tand over here and talk to me a little bit more."[130] At this time, Trooper Acord made Alvarado move again and stand directly between the patrol car and the Defendant's car and states "stand on that line for me and face me."[131] Trooper Acord then asks Alvarado "you don't have any weapon do you?" As Trooper Acord asks this question, he begins to look into Alvarado's pockets, asks what he is carrying, and perform a brief pat down indicating the functional equivalent of an arrest.[132] Furthermore, at no point did Trooper Acord offer to or actually give Alvarado his driver's license back to him. By commanding Alvarado around, demanding Alvarado speak with him, ordering him to move two times, and withholding his license, it was clear that Trooper Acord took control of Alvarado and deprived him of the his freedom to walk or drive away.[133] Moreover these same facts gave the reasonable impression to Alvarado that he was not free to leave.[134]

For the foregoing reasons, "the circumstances [] of [Alvarado's] detention [became] so coercive as to constitute the functional equivalent of an arrest" and, thus, the detention was custodial.[135]

---

[129] Video.
[130] Video.
[131] Video.
[132] Video.
[133] See Busch, 713 A.2d at 100 (holding that a person is subject to custodial interrogation when is deprived of his freedom in a significant way or reasonably believes his freedom of action or movement is restricted).
[134] Gwynn, 723 A.2d at 148.
[135] Mannion, 725 A.2d at 200.

19

### b. Trooper Acord Asked Alvarado Incriminating Questions.

In viewing Trooper Acord's questioning in conjunction with his conduct, it is clear that Alvarado was subject to "interrogation" during the second interaction.

Interrogation occurred during the second interaction because Trooper Acord should have known "that [his] words or actions [were] reasonably likely to elicit an incriminating response."[136] For example, one of the first questions Trooper Acord asked Alvarado during the second interaction was "[w]here are you coming from?"[137] This was a question asked during the first interaction, but this time, the question was asked in an inquisitive tone of voice such as to communicate to Alvarado that Trooper Acord severely doubted the answer Alvarado had previously given. The same can be said for the way in which Trooper Acord re-asked Alvarado "[h]ow come you're heading this way if you're heading home?"[138] Most notably, during the second interaction, Trooper Acord's probing turned into purely incriminating questions. These questions escalated from ones assessing the situation and offering aid to questions seeking to incriminate Alvarado. Trooper Acord should have known that his "words or actions [were] reasonably likely to elicit an incriminating response."[139]

Trooper Acord's questioning was interrogation because his conduct was "calculated to, expected to, or likely to evoke admission."[140] Trooper Acord's conduct and questioning during the

---

[136] Gwynn, 723 A.2d at 149 (ruling that "[i]nterrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect.").
[137] Video.
[138] Video. The patrol video in this case indicates that Alvarado told Trooper Acord he was going home. However, after viewing Alvarado's address on his driver's license, Trooper Acord questioned Alvarado why he was stopped at a certain point on the highway if he lived at the address listed on his driver's license? Mainly, Trooper Acord believed that Alvarado missed his exit, and questioned him to that effect.
[139] Gwynn, 723 A.2d at 149 (highlighting that "[i]nterrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect.").
[140] Mannion, 725 A.2d at 200 (citations omitted).

20

second interaction served no purpose other than to incriminate Alvarado. Trooper Acord testified to his intent to have Alvarado incriminate himself at the suppression hearing:

> Q: So you go to re-approach the defendant. What's going through your mind as you're doing that?
> A: I'm going to talk to him a little bit more just to verify – actually, at that point I'm probably thinking I want to get him to talk to me a little bit more so I get his voice on my audio recorder. And his speech was, obviously, very – he was having trouble answering questions. I just wanted to continue, you know, building my case for his impairment.[141]

Trooper Acord made it clear he wanted to "build his case for impairment" when he directly inquired about Alvarado's drinking that evening. This testimony shows that Trooper Acord's conduct was "calculated to" evoke incriminating statements.[142] After Trooper Acord ordered Alvarado to move, for a second time, between the patrol car and Alvarado's car, Trooper Acord asked Alvarado when his last drink was.[143] Alvarado responded that his last drink was twenty minutes prior to seeing Trooper Acord.[144] Given that the evidence clearly indicated that Trooper Acord suspected a DUI, this question was the linchpin of Trooper Acord's effort to have Alvarado incriminate himself.

For the foregoing reasons, based on the totality of the circumstances—namely the re-asking questions in a way such as to call to doubt Alvarado's answers, the directing of Alvarado's movements, and asking when Alvarado's last drink was—it is clear that Trooper Acord was interrogating Alvarado such that he was required to provide him Miranda warnings.

---

[141] N.T. 5/7/15, 20-21.
[142] See Mannion, 725 A.2d at 200 (asserting that interrogation is police conduct "calculated to, expected to, or likely to evoke admission.").
[143] N.T. 5/7/15, 23-24.
[144] N.T. 5/7/15, 24:1-3.

21

c. **Alvarado Was Subject to A Custodial Interrogation, and Was Not Provided Miranda Warnings. Thus, Alvarado's Statements Made During the Second Interaction Are Suppressed.**

The questioning by Trooper Acord, during the second interaction, was a custodial interrogation. Therefore, Miranda warnings must have been given to Alvarado. As the United States Supreme Court has stated, "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."[145] Because Alvarado was not provided Miranda warnings, the statements obtained during the second interaction were a product of a violation of Alvarado's Constitutional rights.[146] Accordingly, the statements obtained during the second interaction cannot be used against Alvarado and therefore must be suppressed.[147]

d. **This Court Rejects the Commonwealth's Argument That the Second Interaction Was an Investigatory Detention.**

The Commonwealth argues that the second interaction was an investigatory detention supported by reasonable suspicion, not a custodial interrogation. For the reasons previously stated, this Court disagrees and finds that the second interaction was a custodial interrogation. Nonetheless, this Opinion will now address the merits of the Commonwealth's argument.

Alvarado's detention during the second interaction was not temporary, it was permanent and coercive. An "[investigative] detention is temporary . . . and does not possesses the coercive conditions consistent with a formal arrest."[148] Conversely, the custodial detentions are permanent arrests, seizures, or situations where the detention becomes so coercive such as to constitute the

---

[145] Rhode Island v. Innis, 446 U.S. 291, 301–302 (1980).

[146] Gaul, 912 A.2d at 255 (declaring that "[t]he principles surrounding Miranda warnings are also well settled. The prosecution may not use statements stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel.").

[147] In Interest of Mellott, 476 A.2d at 13 (citations omitted)(ruling that "[u]nless a person is advised of his Miranda rights prior to custodial interrogation by law enforcement officers in a criminal proceeding, evidence resulting from such interrogation cannot be used against him.").

[148] DeHart, 745 A.2d at 636.

22

functional equivalent of an arrest.[149] As Trooper Acord testified, Alvarado was not free to leave after the first interaction.

> Q: So, in essence, he was detained, correct?
> A: When I re-approached him?
> Q: Yes.
> A: And I began to question him again?
> Q: Yes.
> A: At that point he was detained, yes.
> Q: He was detained. Not free to leave.
> A: He was not free to leave no.
> Q: And if he tried to walk away you would have stopped him?
> A: Absolutely. [150]

Further, as stated *supra*, Trooper Acord expressed to Alvarado his decision to arrest him by the manner in which Trooper Acord conducted himself, the tenor of his questions and tone of his voice, and manner in which he asked the questions during the second interaction. Objectively viewing the totality of the circumstances and particular facts of this case supports a finding that Trooper Acord gave the impression to Alvarado that he was under arrest. There is no evidence to support a finding that the second interaction was "temporary" or not coercive and significant evidence to the contrary. For this reason, the second interaction was not temporary; it was permanent and, thus, a custodial detention.

The second interaction was not investigative and did not fit the purpose or character of an investigative detention. The purpose of an investigative detention is to provide law enforcement an opportunity to conduct further investigation into suspected criminal activity.[151] When Trooper Acord returned to his patrol car to run Alvarado's driver's license and registration number, he

---

[149] Butler, 729 A.2d at 1137.
[150] N.T. 5/7/15, 32: 4-14.
[151] See DeHart, 745 A.2d at 638 (ruling that an investigatory detention allows law enforcement to investigate suspected criminal activity).

23

notified his partner that Alvarado was a "drunk driver"[152] and that he was "hammered."[153] Trooper Acord uses the term "hammered" when describing somebody who is "more than a little drunk."[154] Trooper Acord then told to his partner that he was not going to let Alvarado change his tire and determined that Alvarado was no longer free to leave.[155]

The foregoing facts clearly indicate that no further investigation was necessary to convince Trooper Acord, who has made roughly 350 DUI arrests, that Alvarado was intoxicated and an arrest was going to be made. For instance, Trooper Acord's use of the word "hammered," and his corresponding description of the term, showed that there was no doubt in his mind that Alvarado was intoxicated. Trooper Acord testified at the suppression hearing that his plan in re-approaching Alvarado was to build his case for impairment.[156] His only efforts in doing so were to ask incriminating questions and subject Alvarado to an interrogation. These circumstances do not fit the purpose of the investigative detention because once the determination to arrest was made, Alvarado was in custody and entitled to his Miranda warnings prior to being interrogated.

This Court believes that Commonwealth v. DeHart is persuasive, distinguishable from the case at hand, and further supports this Court's position. In DeHart, State Troopers and the occupants of a parked car had a mere encounter where the Troopers asked "what's going on here?"[157] The occupant's response aroused suspicions and caused the questioning Trooper to say to his partner "something's not right here, . . . I'm going to get out of the car and see what's going on here."[158] At that point, the Troopers in DeHart exited their vehicle to approach the defendants

---

[152] Video.
[153] N.T. 5/7/15, 20:1-10.
[154] N.T. 5/7/15, 30:7-9.
[155] N.T. 5/7/15, 32:4-14.
[156] N.T. 5/7/15, 20-21.
[157] DeHart, 745 A.2d at 635.
[158] Id.

24

to do determine if there was criminal activity.[159] Consequently, the court's analysis was based largely on finding if there was reasonable suspicion to permit a subsequent investigatory detention (i.e. the Troopers exiting their car and approaching the defendants).[160]

Conversely, here, after the mere encounter between Trooper Acord and Alvarado, Trooper Acord told his partner that Alvarado was a "drunk driver" and that he was "hammered." Trooper Acord then said to his partner that he was not going to let Alvarado change his tire because Alvarado might hurt himself, and that he was not free to leave.[161] Trooper Acord's expressions to his partner are clearly distinguishable from those in DeHart; namely that "something's not right here, . . . I'm going to get out of the car and see what's going on here."[162] Unlike the Troopers in DeHart, Trooper Acord determined there was criminal activity during or after the first encounter. With that determination in mind, unlike the circumstances in DeHart, there was nothing further to investigate. Accordingly, Alvarado was then subject to a custodial interrogation, not an investigatory detention, and entitled to his Miranda warnings.

For the foregoing reasons, this Court rejects the Commonwealth's argument.

II.    **The Blood Alcohol Results Taken At Saint Mary's Hospital Are Suppressed as A Product Of an Unlawful Detainment, in Violation of Alvarado's *Miranda* Rights, and In Violation of the Two Hour Rule.**

Alvarado was charged with 75 Pa. C.S. § 3802(c) which requires "that the alcohol concentration in the individual's blood or breath is 0.16% or higher within *two hours* after the individual has driven, operated or been in actual physical control of the movement of the vehicle."[163] While the Commonwealth agrees that it has no direct evidence as to when Alvarado

---

[159] Id.
[160] Id. at 636–37.
[161] N.T. 5/7/15, 20:14-18.
[162] DeHart, 745 A.2d at 635.
[163] 75 Pa. Cons. Stat. Ann. § 3802 (emphasis added).

25

was driving, it contends that it can meet its burden through circumstantial evidence.[164] Specifically, the Commonwealth argues that it can prove that the test results were taken within two hours of the operation of the vehicle through Alvarado's statement that he drank twenty minutes prior to Trooper Acord's arrival.[165] However, as previously discussed, the statements made during the second interaction, including the statement that Alvarado was drinking twenty minutes before Trooper Acord's arrival and that he was a bar called "The Press," are suppressed.

The suppression of the statements made to Trooper Acord about when Alvarado was drinking is determinative of this suppression ruling. Based on the suppression of the statements, there is no circumstantial evidence or statements that Alvarado was driving, operating or in actual physical control of the movement of the vehicle **within two hours of the blood test** as required by 75 Pa. Cons. Stat. Ann. § 3802.[166]

Earlier in the evening, another State Trooper, Trooper Hand, saw Alvarado on pull over on the shoulder of the road but did not stop because he was on his way to an emergency. There was no evidence as to the time of this observation. There was no evidence of what was the time between the first Trooper seeing Alvarado and when the second Trooper pulled behind him. There was no circumstantial evidence as to how long the car was parked on the shoulder of the road.

Without the statements made by Alvarado as to the time he was drinking, there is no circumstantial statements that Alvarado was driving, operating or in actual physical control of the movement of the vehicle within two hours of the blood test.[167] Therefore the blood test must be suppressed for the charge under 75 Pa. C.S. § 3802(c).

---

[164] N.T. 5/7/15, 10:6-10.
[165] N.T. 5/7/15, 10:10-22.
[166] 75 Pa. Cons. Stat. Ann. § 3802 (emphasis added).
[167] N.T. 5/7/15, 74:17-23. At the suppression hearing, this Court addressed the effect that the suppression of Alvarado's statements would have on the application of the two-hour rule. In doing so, this Court stated the following: "With regard to the two-hour question, if the statement was admissible, I do believe there's sufficient

## CONCLUSION

For the foregoing reasons, this Court properly Granted Alvardao's Motion to Suppress.

BY THE COURT:

DATE: 10-7-2015

ROBERT J. MELLON, J.

---

circumstantial evidence to establish that the test was taken within the two-hour limit and that would have been admissible."

27

*COPIES SENT TO: Commonwealth v. Alvarado,*
*CP-09-CR-000730-2015*


Richard A. Gutman, Esquire
8515 Frankford Avenue
Philadelphia, PA 19136

Jill M. Graziano, Esquire
Office of the District Attorney
Bucks County Justice Center
100 N. Main Street, 2nd Floor
Doylestown, PA 18901